United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 18, 2007**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 04-11432
_____

POSITIVE SOFTWARE SOLUTIONS, INC.,

Plaintiff-Appellee,

versus

NEW CENTURY MORTGAGE CORPORATION;
NEW CENTURY FINANCIAL CORPORATION;
ECONDUIT CORPORATION; THE ANYLOAN COMPANY;
JEFF LEMIEUX; FRANK NESE,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District Texas, Dallas
No. 3:03-CV-257

_____

Before JONES, Chief Judge, REAVLEY, JOLLY, HIGGINBOTHAM, DAVIS, SMITH, WIENER, BARKSDALE, GARZA, DeMOSS, BENAVIDES, STEWART, DENNIS, CLEMENT, PRADO, and OWEN, Circuit Judges.[*]

EDITH H. JONES, Chief Judge, joined by JOLLY, HIGGINBOTHAM, DAVIS, SMITH, BARKSDALE, DeMOSS, DENNIS, CLEMENT, PRADO, and OWEN, Circuit Judges:

The court reconsidered this case en banc in order to determine whether an arbitration award must be vacated for "evident partiality," 9 U.S.C. § 10(a)(2), where an arbitrator failed to disclose a prior professional association with a member of one of the law firms that engaged him. We conclude that the Federal Arbitration Act ("FAA") does not mandate the extreme remedy of

_____

[*]     Circuit Judge KING did not participate in the decision.

vacatur for nondisclosure of a trivial past association, and we reverse the district court's contrary judgment, but it is necessary to remand for consideration of appellee's other objections to the arbitral award.

## BACKGROUND

The facts are undisputed. In January 2001, New Century Mortgage Corporation ("New Century") licensed an automated software support program from Positive Software Solutions, Inc. ("Positive Software"). In December 2002, during negotiations for a renewal of that license, Positive Software alleged that New Century copied the program in violation of the parties' agreement and applicable copyright law. Positive Software then filed this lawsuit against New Century in the Northern District of Texas alleging breach of contract, misappropriation of trade secrets, misappropriation of intellectual property, copyright infringement, fraud, and other causes of action. Positive Software sought specific performance, money damages, and injunctive relief.

In April 2003, the district court granted Positive Software's motion to preliminarily enjoin New Century from using the program and, pursuant to the parties' contract, submitted the matter to arbitration. Following American Arbitration Association ("AAA") procedures, the AAA provided the parties with a list of potential arbitrators and asked the parties to rank the candidates. After reviewing biographical information, the parties selected

2

Peter Shurn to arbitrate the case, as he had the highest combined ranking. The AAA contacted Shurn about serving as an arbitrator, and he agreed, after stating that he had nothing to disclose regarding past relationships with either party or their counsel.

After a seven-day hearing, Shurn issued an eighty-six page written ruling, concluding that New Century did not infringe Positive Software's copyrights, did not misappropriate trade secrets, did not breach the contract, and did not defraud or conspire against Positive Software. He ordered that Positive Software take nothing on its claims and granted New Century $11,500 on its counterclaims and $1.5 million in attorney's fees.

Upon losing the arbitration, Positive Software conducted a detailed investigation of Shurn's background. It discovered that several years earlier, Shurn and his former law firm, Arnold, White, & Durkee ("Arnold White"), had represented the same party as New Century's counsel, Susman Godfrey, L.L.P., in a patent litigation between Intel Corporation and Cyrix Corporation ("the Intel litigation"). One of Susman Godfrey's attorneys in the New Century arbitration, Ophelia Camiña, had been involved in the Intel litigation.

The Intel litigation involved six different lawsuits in the early 1990s. Intel was represented by seven law firms and at least thirty-four lawyers, including Shurn and Camiña. The dispute involved none of the parties to the arbitration. Camiña participated in representing Intel in three of the lawsuits from August

3

1991 until July 1992, although her name remained on the pleadings in one of the cases until June 1993. In September 1992, Shurn, along with twelve other Arnold White attorneys, entered an appearance in two of the three cases on which Camiña worked. Although their names appeared together on pleadings, Shurn and Camiña never attended or participated in any meetings, telephone calls, hearings, depositions, or trials together.

Positive Software filed a motion to vacate the arbitration award, alleging that the award had been procured by fraud, Shurn had manifestly disregarded applicable laws, and, despite the lack of contact between Shurn and Camiña, Shurn had been biased, as evidenced by his failure to disclose his past connection to Camiña. In September 2004, the district court granted Positive Software's motion and vacated the award, finding that Shurn failed to disclose "a significant prior relationship with New Century's counsel," thus creating an appearance of partiality requiring vacatur. Positive Software Solutions, Inc. v. New Century Mortgage Corp., 337 F. Supp. 2d 862, 865 (N.D. Tex. 2004). New Century appealed, and a panel of this court affirmed the district court's vacatur on the ground that the prior relationship "might have conveyed an impression of possible partiality to a reasonable person." Positive Software Solutions, Inc. v. New Century Mortgage Corp., 436 F.3d 495, 504 (5th Cir. 2006). Neither the district court nor the appellate panel found

4

that Shurn was actually biased toward New Century. This court granted New Century's petition for rehearing en banc.

## DISCUSSION

To assure that arbitration serves as an efficient and cost-effective alternative to litigation, and to hold parties to their agreements to arbitrate, the FAA narrowly restricts judicial review of arbitrators' awards. The ground of vacatur alleged here is that "there was evident partiality" in the arbitrator.[1] The meaning of evident partiality is discernible definitionally and as construed by the Supreme Court and a number of our sister circuits.

On its face, "evident partiality" conveys a stern standard. Partiality means bias, while "evident" is defined as "clear to the vision or understanding" and is synonymous with manifest, obvious, and apparent. Webster's Ninth New Collegiate Dictionary 430 (1985). The statutory language, with which we always begin, seems to require upholding arbitral awards unless bias was clearly evident in the decisionmakers.

The panel decision here disagreed with the straightforward interpretation, however, and concluded that, in "a nondisclosure case in which the parties chose the arbitrator," the "arbitrator selected by the parties displays evident partiality by the very failure to disclose facts that might create a reasonable

---

[1] 9 U.S.C. § 10(a)(2)("[T]he United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration . . . where there was evident partiality or corruption in the arbitrators . . . .").

5

impression of the arbitrator's partiality." 436 F.3d at 502. The panel acknowledged a lack of any actual bias in this award even as it substituted a reasonable impression of partiality standard for "evident" partiality in cases of an arbitrator's nondisclosure to the parties. The panel believed this different standard to be required by the Supreme Court's decision in <u>Commonwealth Coatings Corp. v. Continental Cas. Co.</u>, 393 U.S. 145, 89 S. Ct. 337 (1968), which interpreted § 10(b).[2]

How <u>Commonwealth Coatings</u> guides this court is a critical issue. Reasonable minds can agree that <u>Commonwealth Coatings</u>, like many plurality-plus Supreme Court decisions, is not pellucid. Justice Black delivered the opinion of the Court and imposed "the simple requirement that arbitrators disclose to the parties any dealings that might create an impression of possible bias." <u>Id.</u> at 149, 89 S. Ct. at 339. He noted that, while arbitrators are not expected to sever all ties with the business world, courts must be scrupulous in safeguarding the impartiality of arbitrators, who are given the ability to decide both the facts and the law and whose decisions are not subject to appellate review. <u>Id.</u> at 148-49, 89 S. Ct. at 339. Thus, arbitrators "not only must be unbiased but also must avoid even the appearance of bias," <u>Id.</u> at 150, 89 S. Ct. at 340, in order to maintain confidence in the arbitration system.

---

[2] What was then § 10(b) is now contained in § 10(a)(2).

6

Justice White, the fifth vote in the case, together with Justice Marshall, purported to be "glad to join" Justice Black's opinion, but he wrote to make "additional remarks." Id. (White, J., concurring). Justice White emphasized that "[t]he Court does not decide today that arbitrators are to be held to the standards of judicial decorum of Article III judges, or indeed of any judges." Id. Indeed, Justice White wrote that arbitrators are not "automatically disqualified by a business relationship with the parties before them if . . . [the parties] are unaware of the facts but the relationship is trivial." Id. While supporting a policy of disclosure by arbitrators to enhance the selection process, Justice White also concluded, in a practical vein, that an arbitrator "cannot be expected to provide the parties with his complete and unexpurgated business biography." Id. at 151, 89 S. Ct. at 340. His opinion fully envisions upholding awards when arbitrators fail to disclose insubstantial relationships. Id. at 152, 89 S. Ct. at 341.

If one lays primary emphasis on Justice White's statement that he was "glad to join" the plurality, his opinion can be deemed reconcilable with that of Justice Black. Only in that event is the plurality opinion binding on lower courts.

Another compelling reading of the opinions is also possible, however. Justice Black's opinion uses an egregious set of facts as the vehicle to require broad disclosure of "any dealings that might create an impression of possible bias." Id. at

7

149, 89 S. Ct. at 339. Justice White, for his part, hews closely to the facts and finds it "enough for present purposes to hold, as the Court does, that where the arbitrator has a substantial interest in a firm which has done more than trivial business with a party, that fact must be disclosed." 393 U.S. at 151-52, 89 S. Ct. at 340-41 (emphasis added). Justice White, thus read, supports ample but not unrealistic disclosure, and he supports a cautious approach to vacatur for nondisclosure. His "joinder" is magnanimous but significantly qualified.

The latter reading is more persuasive, because it accords scope to the full White opinion, unlike the view that focuses on the introductory "glad to join" sentence. Thus, Justice White's concurrence, pivotal to the judgment, is based on a narrower ground than Justice Black's opinion, and it becomes the Court's effective ratio decidendi. See Marks v. United States, 430 U.S. 188, 193-94, 97 S. Ct. 990, 993-94 (1977).

A majority of circuit courts have concluded that Justice White's opinion did not lend majority status to the plurality opinion. See Nationwide Mut. Ins. Co. v. Home Ins. Co., 429 F.3d 640, 644 n.5 (6th Cir. 2005) ("[A] majority of the Court did not endorse the 'appearance of bias' standard set forth in the plurality opinion"); ANR Coal Co., Inc. v. Cogentrix of N.C., Inc., 173 F.3d 493, 499-500 & n.3 (4th Cir. 1999) (noting that courts have given Justice White's "concurrence particular weight" and holding that "an arbitrator's failure to reveal facts may be

8

relevant in determining evident partiality under 9 U.S.C. § 10(a)(2), but that mere nondisclosure does not in itself justify vacatur"); Morelite Constr. Corp. v. N.Y. City Dist. Council Carpenters Benefit Funds, 748 F.2d 79, 83 n.3 (2d Cir. 1984) ("Because the two opinions are impossible to reconcile, however, we must narrow the holding to that subscribed to by both Justices White and Black"); Merit Ins. Co. v. Leatherby Ins. Co., 714 F.2d 673, 681 (7th Cir. 1983) (noting that Commonwealth Coatings "provides little guidance because of the inability of a majority of Justices to agree on anything but the result"); cf. Univ. Commons-Urbana, Ltd. v. Universal Constructors Inc., 304 F.3d 1331, 1339-40 (11th Cir. 2002) (citing Justice White's Commonwealth Coatings opinion and permitting vacatur only if facts creating "a reasonable impression of partiality" are not disclosed); Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co., 991 F.2d 141, 146 (4th Cir. 1993) ("It is well established that a mere appearance of bias is insufficient to demonstrate evident partiality.  Arbitrators are not held to the same ethical standards required of Article III judges . . . ." (citations omitted)); Ormsbee Dev. Co. v. Grace, 668 F.2d 1140, 1147, 1150-51 (10th Cir. 1982) (citing Justice White's Commonwealth Coatings opinion and requiring "clear evidence of impropriety" for vacatur).  While these courts' interpretations of Commonwealth Coatings may differ in particulars, they all agree that nondisclosure alone does not require vacatur of an arbitral

award for evident partiality. An arbitrator's failure to disclose must involve a significant compromising connection to the parties.

This court's prior caselaw is also consistent with a narrow reading of Commonwealth Coatings. In Bernstein Seawell & Kove v. Bosarge, 813 F.2d 726 (5th Cir. 1987), the losing party in the arbitration challenged the award because of the alleged evident partiality of one of the arbitrators. The arbitrator owned a fractional share of the disputed property and had received commissions on the sale of certain interests. The court held the party had waived his objection to the composition of the panel. Nevertheless, "[e]ven assuming no waiver," he had not produced evidence of evident partiality,[3] because "[t]he appearance of impropriety, standing alone, is insufficient." Id. at 732 (quoting Sheet Metal Workers Int'l Ass'n Local Union 420 v. Kinney Air Conditioning Co., 756 F.2d 742, 746 (9th Cir. 1985)). The court also noted that "[e]vident partiality means more than a mere appearance of bias." Id. (quoting Florasynth, Inc. v. Pickholz, 750 F.2d 171, 173 (2d Cir. 1984)).

Only the Ninth Circuit has interpreted Commonwealth Coatings, as the panel majority did, to de-emphasize Justice White's narrowing language. See Schmitz v. Zilveti, 20 F.3d 1043 (9th Cir. 1994). In Schmitz, the court criticized case law

---

[3] The discussion surrounding the court's finding of no evidence of evident partiality is an alternative holding, not dicta, and accordingly, its discussion of evident partiality is binding precedent on any subsequent panels.

10

suggesting "that an impression of bias is sufficient while an appearance [of bias] is not." Id. at 1047. Commonwealth Coatings, it held, does not merit such a "hairline distinction." Id. Schmitz not only interpreted Commonwealth Coatings to mandate a "reasonable impression of bias" standard in nondisclosure cases but went on to vacate an arbitral award where the arbitrator had not himself been aware of the potential conflict and had failed to undertake due diligence to ascertain and then disclose it to the parties.[4] Even if one ignores the extension of Commonwealth Coatings by Schmitz, the undisclosed relationship between the arbitrator's firm and Pru-Bache's parent company was more current, concrete and financially meaningful than the co-counsel relationship in the present case. Schmitz is an outlier that lends little support to Positive Software.

As we have concluded, the better interpretation of Commonwealth Coatings is that which reads Justice White's opinion holistically. The resulting standard is that in nondisclosure cases, an award may not be vacated because of a trivial or insubstantial prior relationship between the arbitrator and the parties to the proceeding. The "reasonable impression of bias"

---

[4] In Schmitz, the arbitrator's law firm previously had represented Prudential Insurance Co., the parent of Pru-Bache Securities, the prevailing party in the arbitration. The representation involved at least nineteen cases over a thirty-five year period, including a case that ended less than two years before the arbitration. The arbitrator had reviewed documents naming the parent company, but did not run a conflict check for the parent or disclose any of his firm's earlier representations of the parent company prior to the arbitration.

11

standard is thus interpreted practically rather than with utmost rigor.

According to this interpretation of <u>Commonwealth Coatings</u>, the outcome of this case is clear: Shurn's failure to disclose a trivial former business relationship does not require vacatur of the award. The essential charge of bias is that the arbitrator, Peter Shurn, worked on the same litigation as did Ophelia Camiña, counsel for one of the parties. They represented Intel in protracted patent litigation that lasted from 1990 to 1996. Camiña and Shurn each signed the same ten pleadings, but they never met or spoke to each other before the arbitration. They were two of thirty-four lawyers, and from two of seven firms, that represented Intel during the lawsuit, which ended at least seven years before the instant arbitration.

No case we have discovered in research or briefs has come close to vacating an arbitration award for nondisclosure of such a slender connection between the arbitrator and a party's counsel. In fact, courts have refused vacatur where the undisclosed connections are much stronger. <u>See, e.g.</u>, <u>Montez v. Prudential Sec., Inc.</u>, 260 F.3d 980, 982, 984 (8th Cir. 2001) (no vacatur; as general counsel for a company, arbitrator had employed sixty-eight attorneys, paying them $2.8 million in fees, from the law firm representing one of the parties in the arbitration); <u>ANR Coal</u>, 173 F.3d at 495-96 (no vacatur; arbitrator's law firm represented company that indirectly caused the dispute in the arbitration by

buying less from the defendant, who in turn sought to buy less from the plaintiff); Al-Harbi v. Citibank, N.A., 85 F.3d 680, 682 (D.C. Cir. 1996) (no vacatur where arbitrator's former law firm represented party to the arbitration on unrelated matters); Lifecare Int'l, Inc. v. CD Med., Inc., 68 F.3d 429, 432-34 & n.3 (11th Cir. 1995) (no vacatur where arbitrator had memorialized prior scheduling dispute with an attorney from the law firm representing one of the parties and mentioned it eighteen months later at the arbitration; arbitrator also failed to disclose that he became "of counsel" to a law firm the prevailing party had interviewed for the purpose of obtaining representation in the instant dispute and that had reviewed the contract involved in the case two years prior; court found this, at best, showed a "remote, uncertain, and speculative partiality"); Health Servs. Mgmt. Corp. v. Hughes, 975 F.2d 1253, 1255, 1264 (7th Cir. 1992) (arbitrator knew one of the parties, had worked in the same office with him twenty years ago, and saw him about once a year since; the court found this relationship "minimal" and insufficient to vacate); Merit Ins., 714 F.2d at 677, 680 (no vacatur; arbitrator had worked directly under the president and principal stockholder of one of the parties for three years, ending fourteen years prior to the arbitration; the Seventh Circuit noted that "[t]ime cools emotions, whether of gratitude or resentment"); Ormsbee Dev. Co., 668 F.2d at 1149-50 (no vacatur where arbitrator and law firm representing a party had clients in common; requiring vacatur under such facts

13

would "request that potential neutral arbitrators sever all their ties with the business world" (internal quotation omitted)).

The relationship in this case pales in comparison to those in which courts have granted vacatur. See, e.g., Commonwealth Coatings, 393 U.S. at 146, 89 S. Ct. at 338 (business relationship between arbitrator and party was "repeated and significant"; the party to the arbitration was one of the arbitrator's "regular customers"; "the relationship even went so far as to include the rendering of services on the very projects involved in this lawsuit"); Olson v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 51 F.3d 157, 159 (8th Cir. 1995) (arbitrator was a high-ranking officer in a company that had a substantial ongoing business relationship with one of the parties); Schmitz, 20 F.3d at 1044 (arbitrator's law firm represented parent company of a party for decades, including within two years of the arbitration); Morelite, 748 F.2d at 81 (arbitrator's father was General President of the union involved in the arbitrated dispute).

Finally, even if Justice White's "joinder" is not read as a limitation on Justice Black's opinion in Commonwealth Coatings, and the controlling opinion emphatically requires arbitrators to "disclose to the parties any dealings that might create an impression of possible bias," 393 U.S. at 149, 89 S. Ct. at 339, we cannot find the standard breached in this case. The facts of Commonwealth Coatings are easily distinguishable. In Commonwealth Coatings, the arbitrator and a party had a "repeated and

14

significant" business relationship. <u>Id.</u> at 146, 89 S. Ct. at 338. The relationship involved fees of about $12,000 paid to the arbitrator by the party, extended over a period of four or five years, ended only one year before the arbitration, and even included the rendering of services on the very projects involved in the arbitration before him. <u>Id.</u> Such a relationship bears little resemblance to the tangential, limited, and stale contacts between Shurn and Camiña. Nothing in <u>Commonwealth Coatings</u> requires vacatur for the undisclosed relationship in this case.

## Conclusion

Awarding vacatur in situations such as this would seriously jeopardize the finality of arbitration. Just as happened here, losing parties would have an incentive to conduct intensive, after-the-fact investigations to discover the most trivial of relationships, most of which they likely would not have objected to if disclosure had been made. Expensive satellite litigation over nondisclosure of an arbitrator's "complete and unexpurgated business biography" will proliferate. Ironically, the "mere appearance" standard would make it easier for a losing party to challenge an arbitration award for nondisclosure than for actual bias.

Moreover, requiring vacatur based on a mere appearance of bias for nondisclosure would hold arbitrators to a higher ethical standard than federal Article III judges. In his concurrence,

15

Justice White noted that the Court did not decide whether "arbitrators are to be held to the standards of judicial decorum of Article III judges, or indeed of any judges." Id. at 150, 89 S. Ct. at 340 (White, J., concurring). This cannot mean that arbitrators are held to a higher standard than Article III judges. Had this same relationship occurred between an Article III judge and the same lawyer, neither disclosure nor disqualification would have been forced or even suggested. See Chitimacha Tribe of La. v. Harry L. Laws Co., 690 F.2d 1157, 1166 (5th Cir. 1982) (rejecting a finding of judicial bias where the federal judge had represented a party to the case in an unrelated matter at least six years prior). While it is true that disclosure of prior significant contacts and business dealings between a prospective arbitrator and the parties furthers informed selection,[5] it is not true, as Justice White's opinion perceptively explains, that "the best informed and most capable potential arbitrators" should be automatically disqualified (and their awards nullified) by failure to inform the parties of trivial relationships. Commonwealth Coatings, 393 U.S. at 150, 89 S. Ct. at 340.

Finally, requiring vacatur on these attenuated facts would rob arbitration of one of its most attractive features apart

---

[5]     The American Arbitration Association ("AAA"), whose rules governed this proceeding, requires broad prophylactic disclosure of "any circumstance likely to affect impartiality or create an appearance of partiality," so that parties may rely on the integrity of the selection process for arbitrators. Whether Shurn's nondisclosure ran afoul of the AAA rules, however, is not before us and plays no role in applying the federal standard embodied in the FAA.

16

from speed and finality — expertise.  Arbitration would lose the benefit of specialized knowledge, because the best lawyers and professionals, who normally have the longest lists of potential connections to disclose, have no need to risk blemishes on their reputations from post-arbitration lawsuits attacking them as biased.

Neither the FAA nor the Supreme Court, nor predominant case law, nor sound policy countenances vacatur of FAA arbitral awards for nondisclosure by an arbitrator unless it creates a concrete, not speculative impression of bias.  Arbitration may have flaws, but this is not one of them.  The draconian remedy of vacatur is only warranted upon nondisclosure that involves a significant compromising relationship.  This case does not come close to meeting this standard.

The judgment of the district court is **REVERSED,** and the case is **REMANDED FOR FURTHER PROCEEDINGS**.

17

REAVLEY, Circuit Judge, dissenting, joined by WIENER, GARZA, BENAVIDES, and STEWART:

In 1968 the Supreme Court held that an arbitral award could not stand where the arbitrator had failed to disclose a past relationship that might give the impression of possible partiality.[1]  The Court has never changed that holding; it is the law that rules us today.  But the majority of this court disapprove of that law because they prefer to protect arbitrators and their awards when they fail to disclose prior relationships with parties or counsel.  They therefore change the law for this case and, to make it appear as if their transgression does not matter, trivialize their report of the past relationship.   I dissent because this court may not overrule a decision of the Supreme Court.

### Commonwealth Coatings

A.C. Samford Overseas, Inc. was the general contractor on six large construction projects in Puerto Rico.  Commonwealth Coatings Corporation had the painting subcontract for the projects.  A dispute arose about Commonwealth's performance and then its abandonment of the work.  The dispute went to three arbitrators, and the unanimous award of all three awarded Samford $15,872.35.  Commonwealth appealed to the First Circuit on the sole ground of the failure of Capacete, the impartial arbitrator selected by the other two arbitrators, and of appellee Samford, the successful party, to disclose their past relationship.

---

[1]    Commonwealth Coatings Corp. v. Cont'l Cas. Co., 393 U.S. 145, 89 S. Ct. 337 (1969).

18

Capacete was a majority owner of an engineering company that had done work for Samford, including work with the architects planning the projects at issue. He had done no work on the construction or any matter related to questions in the arbitration. When Capacete was being selected to be the third arbitrator, he was not asked about a prior relationship with Samford. The circuit court affirmed the denial of the attack on the award in the absence of bias or prejudice.[2]

The Supreme Court granted certiorari and vacated the arbitral award, saying that while the arbitrator had shown no improper motives, he was required to "disclose to the parties any dealings that might create an impression of possible bias." Id. at 147-49. The majority opinion was written by Justice Black. Justice White also wrote and began by saying: "While I am glad to join my Brother Black's opinion in this case, I desire to make these additional remarks." Six justices vacated the award even though the arbitrator had been fair and impartial.

The Commonwealth Coatings opinions of Justice Black (with Warren, Douglas, and Brennan joining) and Justice White (with Marshall joining) are not lengthy. They are easily compared and easily reconciled. Both opinions emphasize the importance of impartiality for those who decide controversy. Justice White distinguishes the role of judges from that of arbitrators in that the arbitrator's relation with a party is immaterial – so long as the other party is informed in advance and makes no objection. And he points out that a trivial relation

_____

[2]    Commonwealth Coatings Corp. v. Cont'l Cas. Co., 382 F.2d 1010 (1st Cir. 1967).

19

would not create an impression of possible bias so as to meet the rule stated by Justice Black. Justice White's contribution emphasizes the importance of establishing an atmosphere of frankness at the outset of an arbitration by disclosure when the parties are free to reject the arbitrator or accept him with knowledge of the relationship. I am confident that Justices White and Marshall knew what they were saying when they said they joined Justice Black's opinion, and were not describing it as the majority opinion only to be "magnanimous" as our court now says. Furthermore, it is quite pellucid that six Justices of the Court agreed that, despite the fairness and impartiality of the arbitrator, failure to disclose "any dealings that might create an impression of possible bias" justifies vacatur of the award. The Court did vacate that award only for that reason.

Commonwealth Coatings and the Circuit Courts

The majority opinion manages to substitute actual bias, or the reasonable impression of bias, or concrete impression of bias for the Supreme Court's ruling that dealings that might create only an impression of possible bias must be disclosed. And it purports to join other circuits to hold that non-disclosure alone does not require vacatur of an arbitral award. If the circuit courts could overrule the Supreme Court, the majority might be on a bit firmer ground, because the Commonwealth Coatings ruling has not been well received by some of the circuit courts.

For example, Judge Posner declared in 1983 in Merit Insurance Co. v. Leatherby Insurance Co., 714 F.2d 673, 680 (7th Cir.), that the test of the undisclosed relationship must be so intimate as to cast serious doubt on the arbitrator's impartiality. Even though the attack

20

on the arbitral award there was under Rule 60(b) and was rejected because the award did not create a substantial danger of an unjust result, Judge Posner took the occasion to say that Commonwealth Coatings "provides little guidance because of the inability of a majority of Justices to agree on anything but the result." Id. at 681. The following year the Second Circuit had a case where the relationship was of father to son, known from the outset, but Judge Kaufman addressed Commonwealth Coatings as though the opinions of Justice Black and Justice White could not be reconciled and as though they had addressed disqualification of arbitrators rather than failure to disclose. Morelite Constr. Corp. v. New York City Dist. Council Carpenters Benefit Funds, 748 F.2d 79, 82-83 & n.3 (1984). Judge Kaufman saw a problem with Justice Black's statement that arbitrators must avoid the appearance of bias. Id. at 82-83. All will agree with Justice Black's statement that any tribunal trying controversies must avoid bias and the appearance of bias, 383 U.S. at 150, 89 S. Ct. at 340, but this was not a statement of the disclosure requirement of the Court. Other courts have transposed the Supreme Court's disclosure requirement to avoid the "appearance of bias." See, e.g., Sunkist Soft Drinks v. Sunkist Growers, 10 F.3d 753, 758 (11th Cir. 1993); Apperson v. Fleet Carrier Corp., 879 F.2d 1344, 1358 n.19 (6th Cir. 1989); Middlesex Mutual Ins. Co. v. Levine, 675 2d 1197, 1200 (11th Cir. 1982).

We should distinguish the Commonwealth Coatings requirement for disclosure of prior relationships when arbitrators are being selected from what will disqualify an arbitrator after selection. The majority misses that distinction in its discussion of Bernstein Seawell & Kove v. Bosarge, 813 F.2d 726 (5th Cir. 1987).

21

The majority departs from the Supreme Court's ruling by following those courts that have decided that Commonwealth Coatings is a plurality or a "plurality-plus" opinion.[3] But the majority opinion, like the opinions on which it relies, do not explain how Justice Black's majority opinion is irreconcilable with Justice White's concurrence. Aside from Justice White's statement that he was glad to join the majority opinion and the substance of his remarks, Justice White did not articulate an alternative rationale. Justice White merely stated what the Court did not hold, which is not inconsistent with the majority opinion.

The Ninth Circuit followed Commonwealth Coatings in Schmitz v. Zilveti, 20 F.3d 1043 (9th Cir. 1994). In that case the district court had denied vacatur because the arbitrator was unaware of his firm's representation of the parent company of a party because he had run a conflict check on the party but not the parent company, and therefore no evident partiality existed. The Ninth Circuit correctly distinguished cases of bias or appearance of bias and failure to disclose, rejected the view that Commonwealth Coatings was only a plurality decision, and applied the non-disclosure rule of the Supreme Court.

The judicial disfavor of Commonwealth Coatings, while receiving surprisingly little treatment, has not gone unnoticed by commentators. One observed that "[f]ederal courts have floundered in the wake of Commonwealth Coatings" treating Justice White's concurrence as authoritative and standing for a different holding even though Justice White

---

[3] Apperson, 879 F.2d at 1358 n.19; Morelite Constr. Corp., 748 F.2d at 83; Merit Insurance Co., 714 F.2d at 681-82; Middlesex Mutual Ins. Co., 675 F.2d at 1200.

"does not expressly define the standard that should govern arbitrator conduct. His opinion only makes it clear that . . . arbitrators will be governed by a standard less than the standard governing judges." Elizabeth A. Murphy, Note, Standards of Arbitrator Impartiality: How Impartial Must They Be?, 1996 J. DISP. RESOL. 463, 470.

While I can understand the desire to protect the finality of arbitration awards and avoid a return to extended court expense and delay, this does not justify evading the law of the Supreme Court by misstating it or by avoiding it by bleaching the evidence of possible partiality. Nor should we miss the need to promote the impartiality of arbitrators in this time when that is the favored method of dispute resolution. Influence can so easily corrupt the decision-making process even when it is not recognized by the magistrate or arbitrator himself. And to prove bias or improper influence is rarely possible. It is imperative that we not allow even the good faith or memory of the potential arbitrator to control the disclosure decision for, as the Justices made clear in Commonwealth Coatings, it is the protection and reassurance of the party that matters most.[4]

### Positive Software v. New Century Mortgage

---

[4] Perhaps the rule should be different when disclosure of all relationships is expressly required to be made at the outset. And perhaps some allowance should be made for a three member panel of arbitrators, as distinguished from the selection of a single arbitrator by the parties.

The Supreme Court in Commonwealth Coatings derived the statutory authority for vacating the award on the grounds of evident partiality or the use of undue means. 9 U.S.C. § 10. It might also be said that an arbitrator who fails to make a significant disclosure is guilty of "misbehavior by which the rights of any party have been prejudiced." § 10(a)(3).

23

Coming to the case on appeal, New Century seeks borrowers by telemarketing and employs computer devices to call prospects. In January of 2001, New Century obtained a license from Positive Software to use the software product Loan Force developed by Positive Software. Positive Software was then told by former employees of New Century that it was reverse-engineering or copying Loan Force in the effort to develop its own software and dispense with Loan Force. The Software Subscription Agreement, ¶ 7A, prohibited that conduct. Positive Software terminated the license, called for an audit and return of its software, and filed this lawsuit in February of 2003.

Despite assurances by counsel of New Century, efforts by Positive Software and the court for the return of the software and disclosure of its use failed. Positive Software enlisted the aid of the district court in a series of hearings in March and April that culminated on April 28, 2003 in an injunction and protective order by the court, based on a finding that New Century had copied Positive Software's material and enjoining New Century from use of Loan Force software, its database, or the software New Century was claiming to be its own products. Positive Software then moved for a default judgment on the ground that New Century had destroyed evidence. The district court sent the parties to mediation and hearings before a magistrate judge. Finally, on September 26, 2004, the district judge found that its orders had been violated in an order telling the disturbing story. Positive Software Solutions, Inc. v. New Century Mortgage Corp., 337 F. Supp. 2d 862 (N.D. Tex. 2004).

Meanwhile the dispute had gone to arbitration where the award favored New Century completely. The award found that there had been no infringement or breach of the licensing

24

contract and charged Positive Software with several million dollars of damages, fees, and costs.

At the outset of his ruling the arbitrator ridiculed Positive Software's claim and wrote: "It involves a saga of how failure to renew an $86,100 software license has led to a claim for $500,000,000 in damages in this arbitration, and for $38,000,000,000 in Federal Court." The district court expressed curiosity about the explanation for this statement of the arbitrator's disdain. 337 F. Supp. 2d at 886 n.23.

### Susman Godfrey and the Arbitrator

Positive Software searched for an answer to this award and found a prior relationship between counsel for New Century, the Susman Godfrey law firm, and the arbitrator, Peter J. Shurn, a member of the Arnold White & Durkee firm. These two prominent law firms in Houston both represented Intel in its protracted patent litigation with Cyrix.[5] Susman Godfrey began the representation of Intel in August 1991, with Stephen Susman, Terrell Oxford, and Ophelia Camiña appearing. Peter Shurn joined the team in September 1992. He was listed thereafter with Susman, Oxford, and Camiña on docket sheets, motions, pleadings, and briefs.

The only response from Susman Godfrey or New Century is a statement by Ophelia Camiña that her involvement with the Intel litigation began in 1991 and ended in 1992. But

---

[5] Cyrix Corp. v. Intel Corp., 879 F. Supp. 666 (E.D. Tex. 1994); Cyrix Corp. v. Intel Corp., 879 F. Supp. 672 (E.D. Tex. 1994); Cyrix Corp. v. Intel Corp., 803 F. Supp. 1200 (E.D. Tex. 1992).

25

her name and that of Shurn appeared together on multiple pleadings between September 1992 and June 1993. Camiña is shown with Shurn, Susman, and Oxford on a trial motion filed January 19, 1993. And the four appeared together on motions and Intel's notice of appeal filed in 1993. She also appears with Susman Godfrey and Arnold White & Durkee in the list of counsel on an opinion in 1994.

These lawyers were not inactive participants in the Cyrix litigation. One letter was found written by Stephen Susman to opposing counsel detailing the witnesses Intel intended to call at trial, and a copy of the letter went to Peter J. Shurn.

There is no explanation of this relationship from Shurn or Terry Oxford or any member of Susman Godfrey other than Camiña. The district court said that the fact that Camiña's name remained on pleadings and court records, for years after she claimed to have ended her participation, itself gives the appearance of impropriety. Id. at 885.

When Shurn was being considered to arbitrate this dispute, he was told the names of counsel and told of the importance of disclosing any relationship with them. He signed a disclosure for the American Arbitration Association saying that he had nothing to disclose of past relationship with the parties or their counsel, "direct or indirect, whether financial, professional, social or of any other kind." He was further instructed: "If any relationship arises during the course of the arbitration, or if there is any change . . . it must also be disclosed." When Shurn was appointed he was asked: "Have you had any professional or social relationship with counsel for any party in this proceeding or the firms for which they

26

work?" He checked: "I have nothing to disclose." And he signed an oath that he would act in accord with the rules of the American Arbitration Association.

The majority opinion portrays this relationship as trivial by reducing the record to Camiña's statement that she did no work with Shurn. The district court had a different picture of the relationship, one that would have been remembered if Shurn or the other lawyers had given any thought to it, and certainly would have prevented Positive Software from resting its case with Peter Shurn.

Positive Software asked the district court for more discovery of the relationship between the arbitrator and the Susman Godfrey firm, but this request was not granted because the record had already established a failure to disclose a relationship requiring vacatur under the rule of Commonwealth Coatings.

Positive Software has also asked the courts to allow the dispute now to be tried in the good hands of the judiciary, because it cannot afford the expense of another arbitration. Anyone familiar with the experience of Positive Software will understand that request. Further, one will understand the wisdom of the Supreme Court's ruling in Commonwealth Coatings. And, finally, one would follow that ruling and affirm the judgment vacating this arbitration award.

WIENER, Circuit Judge, Specially Concurring in Judge Reavley's dissent, joined by REAVLEY, Circuit Judge:

As I wholeheartedly concur in Judge Reavley's dissent, I write separately only to add a perspective that I find helpful in analyzing this case and demonstrating that Judge Reavley has gotten it right. I refer in general to the key differences between arbitration under the FAA and litigation in federal court; I refer in particular to one difference that is of prime significance in this case, viz., the disparate ways that the decision maker —— an Article III judge on the one hand and an arbitrator on the other —— is selected, and the unique role of the potential arbitrator's unredacted disclosure of his relationships with the parties and their counsel to ensure selection of an impartial arbitrator. These general and particular differences underscore why such full and fair disclosure by a potential arbitrator of <u>every</u> conceivable relationship with a party or counsel, however slight, is a prerequisite. No relationship with a party or a lawyer is too minimal to warrant its <u>disclosure</u>, even if, in the end, it might be deemed to be too minimal to warrant <u>disqualification</u>. Such an evaluation by the potential arbitrator, and any withholding of information based on it, are simply not calls that he is authorized to make, yet ones that Lawyer Shurn obviously made.

The penumbral point that supervenes this case lies in our recognition of the legal distinction between <u>disclosure</u> and <u>disqualification</u> in the context of arbitration. Justice White, in his celebrated and thoroughly vetted concurrence in <u>Commonwealth Coatings</u>

28

Corp., "remarked" that the Supreme Court was <u>not</u> deciding that "arbitrators are to be held to the <u>standards of judicial decorum</u> of Article III judges" or that arbitrators are "automatically <u>disqualified</u> by a business relationship" with the parties to arbitration or their counsel.[1] What must be emphasized is that Justice White did <u>not</u> "remark" that the differences between the standards of decorum applicable to judges and those to which arbitrators are held has anything at all to do with the immutable prerequisite that, before the parties sign off on a candidate for arbitrator, they must have received from him an unexpurgated disclosure of absolutely every past or present relationship with the parties and their lawyers.[2] That the potential arbitrator himself might deem one or more of such relationships to be so <u>de</u> <u>minimis</u> as not to require its divulgence is irrelevant; such culling of information by a candidate must never be allowed to seep interstitially into the <u>disclosure</u> calculus. Justice White's remark that <u>disqualification</u> is not automatic for minor business relationships is simply inapposite to the requirement of full <u>disclosure</u> of every relationship, large and small. This is because, in arbitration, disqualification (more accurately, rejection) is the exclusive province of the parties, each of whom is entitled to make its determination on the basis of total disclosure of relationships, not on the basis of some truncated version that has been cherry-picked by the nominee for the position of arbitrator.

---

[1]     Emphasis mine.

[2]     As noted by Justice White, "relationship" here does not include mere chance encounters or personal introductions.

Most who have commented on Justice White's statement have failed to analyze its full import in depth, treating it either as a tautological musing or as a starting point for holding arbitrators to a lesser degree of impartiality and "recusability" than trial judges. I am convinced, though, that Justice White meant much more, at least regarding the absolute nature of the duty of a potential arbitrator to disclose every relationship large and small. This is because he and the other justices who joined the Black opinion knew full well who it is that has the sole authority and duty to determine whether a candidate for the post of arbitrator should be accepted or rejected: the parties and they alone.

The tradeoffs attendant on the dispute-resolution choice between litigation and arbitration are well and widely known: The principal benefits usually ascribed to arbitration are speed, informality, cost-savings, confidentiality, and services of a decision-maker with expertise and familiarity with the subject matter of the dispute. These "pluses," however, are not without offsetting "minuses." The informalities attendant on proceedings in arbitration come at the cost of the protections automatically afforded to parties in court, which reside in such venerable institutions as the rules of evidence and civil procedure. Likewise sacrificed at the altar of quick and economical finality is virtually the entire system of appellate review, as largely embodied for the federal courts in rules of appellate procedure and the constantly growing body of trial, appellate, and Supreme Court precedent interpreting and applying such rules. By dispensing with such basic standards of review as clearly erroneous, de novo, and abuse of discretion, there remain to parties in arbitration only the narrowest of appellate recourse.

A less frequently encountered and less frequently discussed distinction and its tradeoffs is the one implicated here: the vital difference between the method by which a federal judge is selected to hear a case in litigation vis-à-vis the method by which arbitrators are selected —— a distinction hinted at by Justice White but frequently overlooked or misinterpreted. All know that trial judges in the federal system are nominated and confirmed only after a rigorous testing of their capabilities, experience, and integrity. In contrast, arbitrators are quickly selected by the parties alone, who frequently have unequal knowledge of or familiarity with the full history of potential arbitrators. Federal trial judges are full-time dispute resolvers; the experience of arbitrators falls all along the experience spectrum, from those who might serve but once or twice in a lifetime to those who conduct arbitration with increasing regularity. The trial judge who is to hear a case is almost never "selected" by or agreed on by the parties; rather, such judge is "selected" or designated by objectively random or blind assignment through long established court procedures (except in the rare case of a party's successful forum shopping in a single-judge district, or consenting to try a case to a known magistrate judge). In stark contrast, it is the parties to arbitration themselves who have sole responsibility for the selection of their arbitrator or arbitrators.

It follows then that because they alone do the selecting, the parties to arbitration must be able to depend almost entirely on the potential arbitrator's good faith, sensitivity, understanding, and compliance with the rules of disclosure by candidates for the post. And, even then, appellate relief is an avis rara when it comes to questions of bias, prejudice, or non-disclosure in arbitration. Consequently, except for such background checks that the

31

parties might be able to conduct, the only shield available to the parties against favoritism, prejudice, and bias is full and frank disclosure, "up front," by each potential arbitrator. And even that is far less efficacious than the safeguards that are afforded to parties in litigation through the elaborate rules of professional conduct, disqualification, and recusal, and the body of law and procedure thereon developed in the crucible of the very formal and extensive judicial system.

The point that I belabor here is that, because parties to arbitration have virtually none of the protections against prejudice and bias (or the appearances thereof) that are automatically and routinely afforded to litigants in federal court, the single arrow remaining in the otherwise-empty quiver of protection afforded to parties in arbitration —— full, unredacted  disclosure of every prior relationship —— must be rigorously adhered to and strenuously enforced. Indeed, it is these very differences in the <u>disclosure</u> standards —— not <u>disqualification</u> standards —— to which judges are held vis-à-vis those to which arbitrators are held that demand unyielding felty to both the letter and spirit of the disclosure requirement: With such a slim safeguard against bias or the appearance of bias in arbitration, the reason is obvious why such mandated disclosure of <u>every</u> relationship, without self-abridgment by the potential arbitrator, must be assiduously enforced.

In federal court, it is the system and the judges who perform the "gatekeeper" function to exclude decision-maker favoritism or its appearance. In arbitration, though, it is the parties who are the gatekeepers, and not the potential arbitrators or the arbitration associations (or their rules). Filtration of partiality in arbitration is the exclusive prerogative

32

and duty of the <u>parties</u> —— and only the parties —— as it is they alone who select the decision maker. As gatekeepers, the parties are charged with guarding against favoritism and prejudice, a duty that they cannot possibly discharge in the absence of total disclosure.

In exchange for the actual or perceived economies of time, money, expertise and confidentiality, the parties to arbitration alone are responsible for who it is that will decide their fates. Subject to only relatively insignificant limitations, the parties (or in the case of panels, each party's selected arbitrator) have virtually absolute control over accepting or rejecting a nominee for the role of decision maker. It cannot therefore be left to the fox, who is the potential arbitrator, to guard the arbitration henhouse, secretly identifying to himself alone all "prior or present relationships," then just as secretly deciding which are worthy of disclosure and which are not. On the contrary, avoidance of partiality in the selection of the arbitrator can be achieved only if, in discharging his duty of disclosure, the potential arbitrator objectively disgorges absolutely every conceivable fact of prior or present relationships with parties or counsel, regardless of how tenuous or remote they might seem to him. He must leave to the parties the value judgment as to which (if any) among those fully disclosed facts constitutes a basis for rejecting the potential arbitrator for bias or the appearance of bias. Only of and after that is done can <u>disclosure</u> translate into <u>disqualification</u> or rejection.

Thus the system fails when the nominee for the post of arbitrator takes it upon himself to make the value judgment whether a relationship is so inconsequential that it need not be disclosed at all. Arbitration's scant protection against bias and favoritism obviously breaks

33

down completely when the question whether a relationship should be disclosed is assumed sub silentio by the potential arbitrator rather than by disclosing all and allowing the parties to make that call following their receipt of all facts through an unabridged disclosure.

Who knows? If Shurn had dutifully reported his prior professional relationships and interaction with counsel for New Century, counsel for Positive Software might nevertheless have accepted Shurn. But Shurn's very act of preemptively deciding, solely on his own, that his prior relationship with counsel for New Century need not be disclosed and then withholding that information, conveys an unmistakable appearance of impropriety. To me, that misstep is more than sufficient to support the objections of Positive Software that it was deprived of its right to be informed of the prior relationship between Shurn and the Susman, Godfrey firm, and to make its own evaluation of the significance of that connection.

I end where I began: The vast gulf between resolving disputes in federal court and resolving them in arbitration —— especially the often overlooked distinction between disclosure and disqualification and between who plays the gatekeeper role of selecting the decision maker —— frames the issue we decide today. In arbitration, full disclosure is the proverbial slender reed against which we lean prevention of favoritism to prop up the highly circumscribed ability of a party to ferret out a candidate's prior relationships and then determine whether, as to that party, the relationship does or does not impinge on impartiality. This anorexic reed must not be further slenderized, as the majority does today. For the system to enjoy credibility, each potential arbitrator absolutely must disclose every relationship with the parties and counsel, no matter how minimal or insignificant the aspiring

34

arbitrator might deem it to be. For it is not the prerogative of the candidate to pick and choose, but the prerogative of the parties alone to decide such significance. And that cannot be done with any degree of comfort absent full disclosure. These reasons and those expressed by Judge Reavley compel me to concur in his dissent.