Affirmed and Opinion filed May 17, 2011.

 

In The

 

Fourteenth Court of
Appeals

                                                                                          



NO. 14-09-00651-CV



 

AMOCO D.T. COMPANY, AMOCO X.T. COMPANY, AMOCO Y.T.
COMPANY,

SWEPI LP, SHELL LAND & ENERGY COMPANY, SHELL
ONSHORE

VENTURES INC., SHELL K2, INC., AND SHELL EVEREST,
INC., Appellants

V.

OCCIDENTAL PETROLEUM CORPORATION, OCCIDENTAL PERMIAN

MANAGER, LLC, OCCIDENTAL PERMIAN LTD., AND OXY USA,
INC., Appellees

 



On Appeal from the 215th
District Court

Harris County, Texas

Trial Court Cause No. 2008-54384



 

OPINION

Amoco
D.T. Company, Amoco X.T. Company, Amoco Y.T. Company (collectively, “Amoco appellants”),
SWEPI LP, Shell Land & Energy Company, Shell Onshore Ventures Inc., Shell
K2, Inc., and Shell Everest, Inc. (collectively “Shell appellants”)[1]
entered into a purchase-and-sale agreement (“PSA”) with Occidental Petroleum Corporation,
Occidental Permian Manager, LLC, Occidental Permian Ltd., and Oxy USA, Inc. (collectively,
“Oxy”).  Pursuant to the agreement, Oxy made a demand for arbitration to resolve
a contract dispute, and the case was submitted to arbitration.  In a two-to-one
decision, the arbitration panel decided in appellants’ favor.  Subsequently,
Oxy discovered undisclosed information pertaining to an arbitrator’s relationships
with appellants.  Oxy moved to vacate the award based on the arbitrator’s
evident partiality.  Appellants filed suit in district court to enforce the
arbitration decision.  The trial court determined the evidence established
evident partiality and vacated the arbitration award.  We affirm.

I.   Background

In 1997,
the Amoco and Shell appellants created a partnership, Altura Energy Ltd. (“Altura”),
and contributed their respective oil and gas holdings in the Permian Basin to
Altura.[2] 
In 2000, appellants sold Altura to Occidental Petroleum Corporation pursuant to
the PSA (“Altura transaction”).  In the PSA, the parties agreed to resolve disputes
through binding arbitration before a panel of three neutral arbitrators,
whereby appellants and Oxy would each select an arbitrator, and the third
arbitrator would be chosen by the party-selected arbitrators.

Oxy
initiated arbitration in July 2006 after a dispute arose concerning
interpretation of an environmental-conditions provision of the PSA.  The
arbitration panel was comprised of Shannon Ratliff (selected by Oxy), Thomas
McDade (selected by appellants), and George Chapman (selected by Ratliff and
McDade).  As required, the arbitrators made disclosures regarding their
connections to the parties and potential conflicts.  In March 2007, during the
course of the pre-arbitration proceedings, McDade left his law firm, McDade
& Fogler, and became “of counsel” with the firm of Beck, Redden, &
Secrest, L.L.P. (“Beck Redden”).

Arbitration
hearings began on October 16, 2007 and lasted a week.  The panel issued its
award on August 22, 2008.  In a two-to-one decision, the panel ruled in appellants’
favor, with McDade and Chapman as the majority and Ratliff dissenting.  According
to the PSA, the decision was “binding and nonappealable” except “as provided in
the Federal Arbitration Act” (“FAA”).

Subsequently,
Oxy discovered undisclosed information concerning McDade’s and Beck Redden’s
relationships with appellants that Oxy claims was evidence of McDade’s evident
partiality.  See 9 U.S.C.A. §10(a)(2) (West 2009).  Oxy filed a motion requesting
the arbitration panel to vacate its award, but the arbitrators unanimously
agreed they lacked jurisdiction to consider the motion.  Appellants filed a
motion in district court seeking to confirm the panel’s award.  Oxy countered,
seeking to vacate the award based on McDade’s alleged evident partiality.  The
trial court signed a final judgment denying appellants’ motion to confirm the
arbitration award and granting Oxy’s motion to vacate.  The court also issued
findings of fact and conclusions of law.

II.   Standard of Review and Applicable Law

We begin
with consideration of the trial court’s standard for determining whether to
confirm or vacate an arbitration award.  Review of an arbitration award is
“extraordinarily narrow.”  Statewide Remodeling, Inc. v.
Williams, 244
S.W.3d 564, 568 (Tex. App.—Dallas 2008, no pet.).  The award has the same
effect as a judgment of last resort, and all reasonable presumptions are indulged
in favor of the award.  CVN Grp.,
Inc. v. Delgado, 95 S.W.3d 234, 238 (Tex. 2002) (quoting City of San
Antonio v. McKenzie Constr. Co., 136 Tex. 315, 326 150 S.W.2d 989, 996
(1941)).  An arbitration award governed by the FAA must be confirmed unless it
is vacated, modified, or corrected under certain limited grounds.  See 9
U.S.C.A. § 9 (West 2009); Thomas James Assocs., Inc. v. Owens, 1 S.W.3d
315, 319–20 (Tex. App.—Dallas 1999, no pet.).   A party seeking to vacate an
arbitration award bears the burden of presenting a complete record that establishes
grounds for vacatur.  Williams, 244 S.W.3d at 568.  Under one such
ground, a trial court may vacate an arbitration award “where there was evident
partiality or corruption in the arbitrators, or either of them.”  9 U.S.C.A.
§10(a)(2).  

The
parties sharply disagree on the legal standard a Texas court should apply when considering
whether an arbitrator was evidently partial under the FAA.  Both sides
recognize the United States Supreme Court’s seminal evident-partiality decision,
Commonwealth Coatings Corp. v. Continental Casualty Co., 393
U.S. 145 (1968).  In Commonwealth Coatings, a supposedly neutral
arbitrator failed to disclose that one of the parties to the arbitration was a
regular customer of his engineering-consulting services, including on the
projects underlying the parties’ dispute.  Id. at 146.  In vacating the
arbitration award, Justice Black wrote in an opinion joined by three justices:

It is true
that arbitrators cannot sever all their ties with the business world, since they are not expected to
get all their income from their work deciding cases, but we should, if
anything, be even more scrupulous to safeguard the impartiality of arbitrators
than judges, since the former have completely free rein to decide the law as
well as the facts and are not subject to appellate review.  We can perceive no
way in which the effectiveness of the arbitration process will be hampered by the
simple requirement that arbitrators disclose to the parties any dealings that
might create an impression of possible bias.

Id. at 148–49 (emphasis added).  This principle
is known as the “impression of possible bias” or “appearance of bias”
standard.  

In a
concurring opinion joined by two justices, Justice White began, “While I am
glad to join my Brother Black’s opinion in this case, I desire to make these
additional remarks.”  Id. at 150 (White, J., concurring).  Justice White
expressed that “arbitrators are not automatically disqualified by a business
relationship with the parties before them if both parties are informed of the
relationship in advance, or if they are unaware of the facts but the
relationship is trivial.”  Id. at 150 (White, J., concurring).  He
further wrote, 

Of course,
an arbitrator’s business relationships may be diverse indeed, involving more or
less remote commercial connections with great numbers of people.  He cannot be
expected to provide the parties with his complete and unexpurgated business
biography.  But it is enough for present purposes to hold, as the Court does,
that where the arbitrator has a substantial interest in a firm which has done more than trivial
business with a party, that fact
must be disclosed.  

Id. at 151–52 (White, J., concurring).

            The majority
of federal circuits have construed Justice Black’s opinion as a mere plurality because,
although Justice White stated that he joined Justice Black’s opinion, the
“substantial interest” standard announced by Justice White differed
substantially from the “appearance of bias” standard utilized by Justice Black. 
See, e.g., Positive Software Solutions, Inc. v. New Century Mortg.
Corp., 476 F.3d 278, 281–83 (5th Cir. 2007) (en banc) (explaining that the
majority of federal circuits have concluded that Justice Black’s opinion is a
non-binding plurality decision and adopted a more stringent standard); see
also Merrick T. Rossein & Jennifer Hope, Disclosure and
Disqualification Standards for Neutral Arbitrators: How Far to Cast the Net and
What Is Sufficient to Vacate Award, 81 St. John’s L. Rev. 203, 212–13
(2007) (discussing split among federal circuits).  Unsurprisingly, appellants
seek application of the “substantial interest” standard, whereas Oxy urges
application of the “appearance of bias” standard.

            Appellants
urge us to apply the standard recently annunciated by the Fifth Circuit in Positive
Software.  In Positive Software, after thoroughly analyzing Justice Black’s
and Justice White’s opinions, the court concluded that Justice Black’s opinion
was a non-binding plurality opinion and that the proper standard for determining
evident partiality under the FAA is whether a nondisclosure “involves a
significant compromising relationship.”  Id. at 281–86.  Of course, we
need not follow Positive Software because Fifth Circuit opinions are
persuasive, but not mandatory, precedent in Texas courts.  See Penrod
Drilling Corp. v. Williams, 868 S.W.2d 294, 296 (Tex. 1993).  However,
we are required to follow applicable precedent from the Texas Supreme Court.  Id.

            In Burlington
N. R.R. Co. v. TUCO, Inc., the Texas Supreme Court reviewed an
arbitration award for evident partiality under the Texas Arbitration Act
(“TAA”).  960 S.W.2d 629, 632 (Tex. 1997).  In determining the proper standard
for determining evident partiality, the court relied primarily on Justice
Black’s analysis of evident partiality in Commonwealth Coatings.  Id.
at 633–37.  The court also considered the analyses employed by several
state courts that interpreted “evident partiality” under their respective state
statutes.  Id. at 634–35.  The court indicated that the standard for
evident partiality should be the same under the FAA and the TAA:

While this
Court has not previously determined the scope of this standard, numerous courts
in other jurisdictions have done so, as “evident partiality” is also a basis
for vacating awards under the Federal Arbitration Act, see 9 U.S.C. § 10, as well as the arbitration
statutes of many sister states.   

Id. at 632.  

The
court recognized the differences between Justice Black’s and Justice White’s
opinions and acknowledged that several federal and state courts were split on the
application of Commonwealth Coatings.  Id. at 633–35.  The
court noted that two Texas courts of appeals had adopted a standard for reviewing
evident partiality that paralleled Justice Black’s standard.  Id. at 635
(citing City of Baytown v. C.L. Winter, Inc., 886 S.W.2d 515 (Tex.
App.—Houston [1st Dist.] 1994, writ denied) (applying standard from Babcock
to evident partiality review under TAA); Babcock & Wilcox Co. v. PMAC,
Ltd., 863 S.W.2d 225 (Tex. App.—Houston [14th Dist.] 1993, writ denied)
(reviewing arbitration award governed by FAA and explaining, “A party seeking
to vacate an award on the basis of evident partiality must prove the existence
of facts which would establish a reasonable impression of the arbitrator’s
partiality to one party”)).  The court then discussed the strong policy for
requiring up-front disclosure:

To choose
their arbitrators intelligently, however, the parties must have access to all
information which might reasonably affect the arbitrator’s partiality.  This
allows the parties to evaluate any potential bias at the outset, rather than
shifting the burden to the courts to do so when a dissatisfied party challenges
an award.

Id.  Having considered interpretations
of the evident-partiality standard by other courts, and policies supporting the
evident-partiality rule, the court adopted a standard resembling Justice Black’s
standard: 

[A]
prospective neutral arbitrator . . . exhibits evident partiality if he or she
does not disclose facts which might, to an objective observer, create a
reasonable impression of the arbitrator’s partiality.  

Id. at 636.  

Although
agreeing that an arbitrator need not disclose trivial relationships, the court
explained that “evident partiality is established from the nondisclosure
itself, regardless of whether the nondisclosed information necessarily
establishes partiality or bias.  Those courts which have failed to recognize a
comparable standard have, we believe, needlessly involved themselves in
evaluations of partiality that are better left to the parties.”  Id. at
636–37 (citations omitted).  Furthermore, the court declined to hold that only
direct financial relationships are required to be disclosed: “[P]arties should
have access to all information that might reasonably affect the potential arbitrator’s
impartiality.  This could obviously include, for example, a familial or close
social relationship.”  Id. at 637.  Finally, the court rejected the
notion that an award should be affirmed when reasonable persons might debate
whether the circumstances indicate evident partiality: “[T]he fact that a
reasonable person could conclude that the [circumstances] might affect
[the arbitrator’s] impartiality triggers the duty to disclose.”  Id. at
639. 

We
conclude that TUCO prescribes the standard for determining evident
partiality under either the TAA or FAA.[3] 
The supreme court’s goal to foster a single standard for evident partiality is
logical because the evident-partiality sections are substantially the same
under the TAA and FAA.  Compare 9 U.S.C.A. §10(a)(2) (“[A] court . . . may make an order
vacating the award upon the application of any party to the arbitration . . .
where there was evident partiality or corruption in the arbitrators, or either
of them.”), with Tex. Civ. Prac. & Rem. Code Ann. § 171.088(a)(2)(A)
(West 2011) (“On application of a party, the court shall vacate an award if . .
. the rights of a party were prejudiced by . . . evident partiality by an
arbitrator appointed as a neutral arbitrator[.]”).[4] 


Moreover,
the public policy for requiring up-front disclosure is the same under both statutes. 
See Thomas
James Assocs., 1
S.W.3d at 320–21 (applying TUCO standard in case governed by FAA because
“the public policy of encouraging up-front disclosure of possible arbitrator
bias or partiality is equally applicable to arbitrations governed by the TAA or
the FAA”); see also Perry Homes v. Cull, 173 S.W.3d 565, 570–71
(Tex. App.—Fort Worth 2005) (applying TUCO in FAA case), rev’d on
other grounds, 258 S.W.3d 580 (Tex. 2008).  Therefore, any change to
the standard for determining evident partiality should emanate from the supreme
court.  

Accordingly,
the same standard for determining evident partiality is applicable whether the
arbitration is governed by the FAA or TAA.  Courts decide whether the neutral arbitrator
exhibited evident partiality by determining whether he failed to disclose facts which might, to an
objective observer, create a reasonable impression of his partiality.  TUCO,
960 S.W.2d at 636.  Evidence of nondisclosure is, without more, sufficient to
establish partiality regardless of whether the undisclosed information
necessarily proves partiality or bias.  Id. at 636.  However, if an
objective observer could not believe the undisclosed information might create a
reasonable impression of partiality, the information is trivial and the
arbitrator did not exhibit partiality by failing to disclose it.  Id. at
636–37; see also Mariner Fin. Grp., Inc. v. Bossley, 79
S.W.3d 30, 32–33 (Tex. 2002) (“[T]he consequences for nondisclosure are
directly tied to the materiality of the unrevealed information.”).

Having decided
the legal standard for determining evident partiality, we next determine the
standard an appellate court applies when reviewing the trial court’s evident-partiality
determination.  We review de novo a trial court’s decision to confirm or
vacate an arbitration award.  Tanox, Inc. v. Akin, Gump, Strauss, Hauer
& Feld, L.L.P., 105 S.W.3d 244, 250 (Tex. App.—Houston [14th
Dist.] 2003, pet. denied); see also In re Chestnut Energy Partners, Inc.,
300 S.W.3d 386, 397 (Tex. App.—Dallas 2009, pet. denied).  Nevertheless, “[t]he ‘evident partiality’ question
necessarily entails a fact intensive inquiry.  This is one area of the law
which is highly dependent on the unique factual settings of each particular
case.”  Bossley, 79 S.W.3d at 34 (quoting Lifecare Int’l,
Inc. v. CD Med., Inc., 68 F.3d 429, 435 (11th Cir.1995)).  Although the
ultimate question regarding whether an arbitrator exhibited evident partiality
is one of law applied to facts, in order to determine the facts, the trial
court will necessarily resolve conflicts in the evidence.  We agree with the El
Paso Court of Appeals’s recent explanation relative to our review of fact
findings underlying a trial court’s decision to confirm or vacate an
arbitration award:

Legal
issues must be reviewed de novo.  But when a trial court undertakes to
resolve fact disputes in the context of a claim of evident partiality or
misconduct, the trial court’s fact findings must be reviewed for legal and
factual sufficiency while its legal conclusions will be reviewed de novo.
 Consequently, the standard of review we will employ depends on whether the
trial court resolved any factual issues.  

Las Palmas Med. Ctr.
v. Moore, ---
S.W.3d ---, No. 08-09-00226-CV, 2010 WL 3896501, at *7 (Tex. App.—El Paso, Oct.
6, 2010, pet. denied).

III.   Analysis

In its motion
for vacatur, Oxy argued McDade exhibited evident partiality because he failed
to disclose the following facts: (1) during the course of the arbitration, Beck
Redden attorney David Gunn represented BP Products North America, Inc. (“BP
Products”), a BP Amoco p.l.c. subsidiary, in mandamus proceedings in Texas; (2)
during the course of the arbitration, a Beck Redden attorney began representing
several BP Amoco p.l.c. subsidiaries; (3) Beck Redden represented Shell Oil
Company from 1994 to 1999; and (4) after the arbitration panel issued its
award, Shell designated McDade as an arbitrator in unrelated matter.  We first
consider Oxy’s contention that McDade’s partiality was exhibited by his failure
to disclose that Gunn was contemporaneously representing BP Products in mandamus
proceedings.   

A.   Whether Oxy
waived conflict by failing to investigate McDade’s background

Appellants argue that Oxy waived any argument concerning the
BP Products representation because Oxy had a duty to investigate McDade’s
background but failed to do so.  According to appellants, Oxy could have easily
performed an online search and discovered Beck Redden’s representation of BP
Products.  Appellants presented the following affidavit testimony in support of
this argument:

On May
11, 2009, [a representative of the Amoco appellants] ran a search on Google
with the terms “Beck,” “Redden,” and “Amoco.”  The fourth search result was the
“Reply to Response to Petition for Writ of Mandamus” that BP Products North
American, Inc. filed in a mandamus proceeding before the Texas Supreme Court in
Cause No. 07-0119.  David Gunn, an attorney for [Beck Redden], is listed as one
of the counsel for BP Products on the first page of the Reply. . . .  I also
visited the Texas Supreme Court’s website, which shows that the Reply was filed
on February 20, 2007.  

Appellants also argue that Oxy was presented with a “red
flag” regarding McDade’s partiality but declined to investigate.  Specifically,
McDade sent an ex parte letter to the Amoco appellants’ counsel informing him
of Beck Redden’s potential conflicts with the Amoco appellants.  The Amoco
appellants’ counsel informed McDade via letter that the Amoco appellants waived
these conflicts; Oxy’s counsel was copied on this letter.  Oxy’s counsel then sent
McDade a letter requesting that he disclose Beck Redden’s potential conflicts
with Oxy.  McDade never responded to this letter or made further disclosures to
Oxy.  Oxy later approved McDade’s participation on the arbitration panel.  During
vacatur proceedings, Oxy contended that McDade’s ex parte communications with the
Amoco appellants’ counsel was some evidence of his partiality.  According to appellants,
Oxy’s failure to raise concerns regarding the ex parte communication before it
approved McDade as one of the arbitrators established its willingness to waive
McDade’s and Beck Redden’s potential conflicts.  In its findings of fact, the
trial court expressly found that Oxy did not waive its evident-partiality
challenge because it was unaware of the Beck Redden representations.  Further,
appellants neither requested nor received a finding relative to whether a
reasonable investigation would have revealed these representations.   

We have found no case in which a Texas court determined
whether an arbitrating party waives an arbitrator’s conflicts if the party
fails to investigate the arbitrator’s background.  In Bossley, the
supreme court specifically declined to decide this issue because, even assuming
a duty to investigate existed, the evidence did not establish the complaining
party could have discovered the information through investigation.  79 S.W.3d
at 33.

In Houston
Village Builders, Inc. v. Falbaum, our court was asked to decide whether arbitrating
parties have a duty to investigate.  105 S.W.3d 28, 35 (Tex. App.–Houston
[14th Dist.] 2003, pet. denied).  Similar to the supreme court in Bossley,
this court did not address the issue, holding instead that the party opposing
vacatur has the burden to prove waiver.  Id.  This court concluded the party
opposing vacatur did not present evidence establishing that the party seeking
vacatur would have discovered the information through “reasonable investigation.” 
Id.; see also J.D. Edwards World Solutions Co. v. Estes, Inc., 91
S.W.3d 836, 844 (Tex. App.—Fort Worth 2002, pet. denied) (concluding
evidence did not support conclusion that losing party could have “easily
discovered” full nature of arbitrator’s relationship with winning party).

Similarly, we conclude appellants failed to prove that a reasonable
investigation would have resulted in Oxy’s discovery of Beck Redden’s
representation of BP Products.  A 2009 Google search does not necessarily
reflect what a 2007 and 2008 search would have revealed.  Further, Oxy was
unaware that Beck Redden was involved in BP Products’s petition for writ of
mandamus and therefore had no reason to search the supreme court’s website regarding
the petition.  Finally, Oxy’s failure to investigate after its request for
disclosures were unanswered is not evidence that Oxy was aware of, but waived,
potential conflicts; Oxy could have reasonably interpreted McDade’s failure to
respond as an indication that no additional conflicts existed.[5] 
Accordingly, we hold appellants did not present evidence establishing that OXY
would have discovered the BP Products representation through “reasonable
investigation.”[6]

B.   BP Products’s connection to the
arbitration proceedings

The
following facts are undisputed:

·       
On January 16, 2007, apparently in anticipation of McDade joining
Beck Redden, Beck Redden generated a conflict report using various Oxy, Amoco,
and Shell search terms.  

·       
Page fifteen of the conflict report indicates that Beck Redden
attorney David Gunn represented BP Products in a matter described as “In Re:
Texas City Explosion.”  The “Open Date” for this representation was
“10/18/2006.”

·       
BP Products is the sister company of BP America Production
Company, which is the direct parent company of appellant Amoco D.T. and the “grandparent”
company of appellants Amoco X.T. and Amoco Y.T.

·       
Gunn was one of several attorneys who filed a petition for writ
of mandamus on behalf of BP Products in the Texas Supreme Court on February 14,
2007.  Gunn was not the lead attorney or signatory of the petition and did not
participate in oral argument for the petition.  

·       
BP Products was seeking a writ of mandamus to prevent the apex
deposition of Lord John Browne, CEO of BP Amoco p.l.c., the ultimate parent of BP
Products and the Amoco appellants. 

·       
The supreme court issued its opinion on the petition on January
25, 2008.  

·       
McDade had actual knowledge that Beck Redden was representing BP
Products but did not disclose this representation to Oxy.

·       
Heather Skinazi, an in-house attorney for Occidental Petroleum
Corporation, swore in an affidavit that she was unaware of Beck Redden’s
representation of BP Products until after the arbitration panel issued its
award and that, to her knowledge, “no one else at Oxy was aware of this
information before the issuance of [the award.]”  Similarly, John A. “Jad”
Davis and Deborah G. Hankinson, each an attorney of record for Oxy, swore in
affidavits that they were unaware of Beck Redden’s representation of BP Products
until after the arbitration panel issued its award.

Appellants
argue BP Products’s tenuous relationship to the Amoco appellants (BP Products
is the sister company of a parent of the Amoco appellants) rendered the
nondisclosure trivial.  Appellants cite Beck Suppliers, Inc. v. Dean Witter
Reynolds, Inc., in which an Ohio court of appeals determined evident
partiality was not established by proof that the arbitrator’s law firm had
previously represented the parent and sister companies of the prevailing party. 
558 N.E.2d 1187, 1192–93 (Ohio App. 1990) (per curiam).  Specifically, the
court expressly applied the standard articulated in Justice White’s Commonwealth
Coatings concurrence and held the “‘relationship’ between the arbitrator
and the [prevailing party] is too indirect and remote to substantiate any
inference of bias.  [Cases in which bias was inferred] are therefore
distinguishable from the case sub judice because they involved a direct
relationship between the prevailing party and the arbitrator.”  Id. at
1193 (citation omitted).  Additionally, appellants argue that Oxy’s reliance on
Schmitz v. Zilveti is misplaced because the undisclosed representation
in that case is inapposite; the Ninth Circuit Court of Appeals concluded the
arbitrator’s firm’s representation of the parent company of an
arbitrating company exhibited evident partiality.  20 F.3d 1043, 1049 (9th Cir.
1994).

We
recognize the degree of corporate distinction between the Amoco appellants and
BP Products and that such may be a factor in determining evident partiality.  See
GE Commercial Distrib. Fin. Corp. v. Momentum Transp. Servs., L.L.C., No.
09-09-00162-CV, 2009 WL 6327471, at *8 (Tex. App.—Beaumont Apr. 8, 2010, no
pet.) (mem. op.) (concluding undisclosed relationship did not establish evident
partiality because the relationship involved a separate and distinct
corporation).  However, other factors bear on whether the BP Products
representation was trivial.  As noted above, it is undisputed McDade was aware
of Beck Redden’s representation of BP Products and this representation appeared
on Beck Redden’s conflict report.  It is also undisputed that several BP entities
signed the closing document to the Altura transaction, including ultimate
parent BP Amoco p.l.c.  Further, even if McDade was unaware of BP’s connection
to Amoco, evidence was presented at the arbitration hearings concerning the
1999 merger between BP and Amoco.  Accordingly, there were several facts
indicating BP’s involvement in the underlying transaction, and McDade had a
duty to determine whether the BP Products representation might create a
reasonable impression of his impartiality thus requiring disclosure.  See TUCO,
960 S.W.2d at 636.[7]


Here, an
investigation into the nature of the BP Products representation would have
revealed that Gunn was working with several other attorneys in seeking a writ
of mandamus to prevent the apex deposition of Lord Browne, CEO of BP Amoco p.l.c.,
the ultimate parent company of BP Products and the Amoco appellants.  Appellants
attempt to trivialize the importance of these facts by arguing Beck Redden did
not represent BP Amoco p.l.c. or Lord Browne, and that Lord Browne retired from
BP Amoco p.l.c. before the petition for writ of mandamus was resolved by the
supreme court and before hearings began in the underlying arbitration.  Nevertheless,
the fact remains that Beck Redden was involved in preventing the deposition of
the CEO of the ultimate parent company of the Amoco appellants contemporaneous
to the time when the parties approved McDade as a member of the arbitration
panel.  Moreover, additional facts indicate the materiality of the BP Products
representation:  

·       
During the arbitration hearings, one of the lead negotiators for “BP
Amoco” in the Altura transaction testified that a “strategic decision” was made
to sell Altura and focus on more long-term assets.  The same negotiator signed
the closing documents for the transaction on behalf of “BP Amoco p.l.c.” [8] 


·       
In their briefing to the arbitration panel, appellants argued
that the closing agreement affirmed that the PSA released Amoco from its
indemnity obligations relative to environmental claims—the subject matter of the
arbitration.  In other words, appellants argued that the closing agreement in
conjunction with the PSA supported their position in the arbitration.  

·       
Another witness testified during the arbitration hearings that
Lord Browne announced “he would dispose of these assets . . . by the end of the
year,” apparently referring to Altura.  

·       
A letter in which Oxy presented an offer for Altura was sent to
the “Group Vice President of Mergers and Acquisitions” for “BP Amoco, p.l.c.”  

·       
Evidence presented during the arbitration showed that BP Amoco
p.l.c. and appellee Occidental Permian Ltd. entered into an agreement on the
same day that the closing agreement was signed whereby BP Amoco p.l.c.
guaranteed a $1.135 billion loan that Occidental Permian Ltd. made to another
BP entity.

Accordingly,
an objective person
could reasonably conclude that Beck Redden’s participation in mandamus
proceedings to prevent Lord Browne’s deposition was a material nondisclosure
because the arbitration proceedings were rife with evidence of BP Amoco
p.l.c.’s and Lord Browne’s involvement in the Altura transaction.  

C.   McDade’s connection to the BP
Products representation

Appellants
further argue that the undisclosed BP Products representation did not support
evident partiality because McDade had no involvement or financial interest in the
matter.  According to appellants, McDade was merely “of counsel” at Beck Redden
and did not stand to benefit financially by favoring appellants.  As noted
above, the supreme court expressly rejected an invitation to hold that only an
arbitrator’s direct financial or business relationships may form the basis of
his evident partiality.  TUCO, 960 S.W.2d at 637 (“[P]arties should have
access to all information that might reasonably affect the potential
arbitrator’s impartiality.  This could obviously include, for example, a
familial or close social relationship.”).  Further, even in an “of counsel”
capacity, McDade has a business relationship with Beck Redden and its attorneys
and was paid a salary by Beck Redden.  It would not be unreasonable for a
person to assume that appellants would be more inclined to continue to use Beck
Redden’s and McDade’s services if appellants prevailed in the arbitration.  In
fact, it is undisputed that shortly after the panel issued its award, Shell
designated McDade as an arbitrator in unrelated matter.

D.  
Beck Redden’s opposition to BP in a separate matter does not render the
undisclosed BP Products representation immaterial  

Appellants
also contend that any impression of bias raised by Beck Redden’s BP Products
representation was neutralized by the fact that Beck Redden was at the same
time representing a client in litigation against BP America Production
Company—the direct parent of two of the Amoco appellants.  However, whether Oxy
would have found this fact significant is a question that should have been resolved
by Oxy.  See id. at 636 (“[Courts that consider whether undisclosed
information establishes partiality have] needlessly involved themselves in
evaluations of partiality that are better left to the parties.”).  For example,
Oxy could have decided that the conflict stemming from Beck Redden’s attempt to
prevent the deposition of the CEO of the pinnacle BP/Amoco entity rendered McDade
objectionable despite Beck Redden’s adverse representation to BP America
Production Company. 

E.   Oxy does not have the burden to prove it would
have objected to McDade if information had been disclosed

Finally,
appellants contend the trial court erred by vacating the arbitration award
because Oxy failed to present any evidence it would have objected to McDade if
he had timely disclosed the BP Products representation.  Appellants argue the record
actually supports an inference Oxy would not have objected because (1) Oxy did
not object when McDade disclosed that he represented wholly-owned subsidiaries
of Shell approximately twenty-years ago and (2) the trial court expressed on
the record that Oxy would not have objected had McDade made the disclosures.  However,
whether the party asserting evident partiality would have actually objected to
the undisclosed information is not an element of the evident-partiality
standard.  “[E]vident partiality is established from the nondisclosure
itself, regardless of whether the nondisclosed information necessarily
establishes partiality or bias.”  TUCO, 960 S.W.2d at 636.  In other
words, evident partiality is established by an arbitrator’s failure to disclose
non-trivial information; whether earlier disclosure would have prompted a party
to object is superfluous.[9]

F.   Application of TUCO
standard to facts

In sum,
(1) BP Amoco p.l.c. and Lord Browne were involved in the transaction underlying
the arbitrated dispute, (2) Beck Redden’s representation of BP Products
involved preventing the apex deposition of Lord Browne, CEO of BP Amoco p.l.c.,
and  (3) even as “of counsel” to Beck Redden, McDade had a business interest in
Beck Redden that could affect his partiality.  We conclude that McDade’s
failure to disclose Beck Redden’s BP Products representation might, to an objective observer, create a
reasonable impression of his partiality.  See TUCO, 960 S.W.2d at
636.  We recognize that evident partiality is generally proved by an
arbitrator’s nondisclosure of his own potential conflicts,[10]
whereas here, McDade’s evident partiality was proved by his nondisclosure of his
firm’s potential conflicts.  Nevertheless, the fact that a reasonable
person could conclude the circumstances might have affected McDade’s
impartiality triggered his duty to disclose.  See id. at 639.  Thus, the
fact that McDade failed to disclose non-trivial information was sufficient to establish
evident partiality.  Id. at 636.  We need not consider whether Oxy’s
additional allegations establish McDade’s evident partiality.     

   Accordingly,
we overrule the appellants’ sole issue and affirm the trial court’s judgment.

 

                                                                                    

                                                                        /s/        Charles
W. Seymore

                                                                                    Justice

 

 

Panel consists of Justices Frost,
Seymore, and Christopher.









[1]
We use the term “appellants” when referring to Amoco appellants and Shell
appellants jointly.





[2]
The exact details regarding formation of Altura are unclear from the record. 
For purposes of this appeal, we glean facts relative to formation of Altura
from the PSA and that section of the final arbitration award entitled
“Preliminary Statement and Undisputed Facts.”





[3] Admittedly, in TUCO, the neutral arbitrator
accused of evident partiality was selected by the other two party-selected
arbitrators, 960 S.W.2d at 630, whereas McDade was selected only by the
appellants.  Thus, McDade, although undisputedly a neutral arbitrator, was not
“selected by the parties or their representatives” as was the challenged
arbitrator in TUCO.  Id. at 636.  However, this distinction is
immaterial because the TUCO standard for evident partiality extends “to
all neutral arbitrators, regardless of the method for their selection.”  Houston
Vill. Builders, Inc. v. Falbaum, 105 S.W.3d 28, 32 (Tex. App.—Houston
[14th Dist.] 2003, pet. denied) (citing Mariner Fin. Grp., Inc. v. Bossley, 79
S.W.3d 30, 32–33 (Tex. 2002)).              

 





[4]
At the time TUCO was issued, language pertaining to evident partiality
was in section 171.014.  For our purposes, the material portions of former
section 171.014 and current section 171.088 are identical.





[5]
Additionally, concluding that this situation necessitated further action from
Oxy would shift the burden of disclosure from McDade to Oxy, contravening the
well-established rule that the duty to disclose rests on the arbitrator.  See
Bossley, 79 S.W.3d at 33 (“It is
well-established
. . . ‘a neutral arbitrator
has a duty to disclose dealings
of which he or she is aware that might
create an impression
of possible bias.’”
(quoting Commonwealth Coatings, 393 U.S. at 149)).   





[6]
Appellants also apparently argue that Oxy purposefully failed to investigate
McDade’s background because Oxy investigated arbitrator Chapman’s background. 
However, appellants do not cite evidence supporting such a finding.





[7]
In other words, an arbitrator cannot intentionally fail to determine whether
information known to him is trivial or material and later claim, when accused
of evident partiality, that he was unaware of the nature of the information. 
An arbitrator’s failure to determine whether known information exhibits a
conflict between the arbitrator and an arbitrating party may be evidence of the
arbitrator’s bias toward that party.





[8] Oxy also argues it is significant that Eileen A.
Kamerick signed the closing document on behalf of Amoco X.T., Amoco Y.T., and
Amoco Oil Company, which later became BP Products.  However, we disregard this
fact because Oxy does not cite evidence reflecting McDade was, or should have
been, aware that BP Products was formerly known as Amoco Oil Company.  





[9]
Additionally, requiring a party to prove it would have objected to the
undisclosed information would likely require speculative and otherwise
objectionable testimony.  





[10]
See, e.g., Commonwealth Coatings, 393 U.S. at 146–50; TUCO,
960 S.W.2d at 637; Falbaum, 105 S.W.3d at 33; J.D. Edwards, 91
S.W.3d at 844; Tex. Commerce Bank, N.A. v. Universal Technical Inst. of Tex.,
Inc., 985 S.W.2d 678, 681 (Tex. App.—Houston [1st Dist.] 1999, pet. dism’d
w.o.j.).  But see Schmitz, 20 F.3d at 1049 (determining arbitrator’s
failure to disclose his law firm’s prior representation of a parent company of
one of the parties established the arbitrator’s evident partiality).