# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
September 14, 2020

Lyle W. Cayce
Clerk

No. 19-20002

OOGC AMERICA, L.L.C.,

　　　　Plaintiff – Appellee,

v.

CHESAPEAKE EXPLORATION, L.L.C.,

　　　　Defendant – Appellant.

-----------------------------------------------------------------

Consolidated with 19-20003

OOGC AMERICA, L.L.C.,

　　　　Plaintiff – Appellee,

v.

CHESAPEAKE EXPLORATION, L.L.C.,

　　　　Defendant;

D. PATRICK LONG,

　　　　Movant – Appellant.

Appeals from the United States District Court
for the Southern District of Texas

No. 19-20002 c/w No. 19-20003

Before ELROD, WILLETT, and OLDHAM, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

This consolidated appeal concerns an arbitration dispute between two oil and gas companies, OOGC America, L.L.C. and Chesapeake Exploration, L.L.C. OOGC brought the lawsuit to vacate two arbitration awards favoring Chesapeake on the basis of an arbitrator's failure to disclose connections with certain non-parties. The district court vacated the awards, and Chesapeake appeals. The arbitrator, Patrick Long, appeals the district court's denial of his motion to intervene and also seeks leave to intervene on Chesapeake's appeal in order to protect his reputational interest. We VACATE the district court's arbitration ruling and REMAND the action with instructions to confirm the arbitration awards within thirty days of the issuance of the mandate. We AFFIRM the district court's denial of Long's motion to intervene and DENY AS MOOT his motion to intervene on appeal.

I.

Chesapeake is an Oklahoma LLC with headquarters in Oklahoma. OOGC is a Delaware LLC with its headquarters in Texas. In late 2010 and early 2011, Chesapeake sold OOGC partial interests in two oil and gas properties. Soon, a contract dispute arose out of two Development Agreements and a pair of accompanying Joint Operating Agreements (collectively, "the Agreements") between the two that governed their joint venture.[1]

The Agreements provided that Chesapeake, as the operator, would pay the expenses up front and then charge the expenses to a joint account. Then Chesapeake would bill OOGC for its proportionate share of the costs. The Agreements permitted Chesapeake to bill work performed by "affiliates" or "related parties" to the joint account, but required that such work must be

---

[1] The two sets of agreements are functionally identical.

compensated "at competitive rates that do not exceed the prevailing rates in the area."

The Agreements also established that any dispute would be resolved through arbitration and provided guidelines by which that arbitration would be conducted. One such guideline stated that an arbitrator must not have performed material work for affiliates within the preceding five years. Another required that the arbitration be conducted by a panel of three arbitrators in accordance with the American Arbitration Association ("AAA") rules.

In 2014, OOGC became concerned that Chesapeake was overbilling it by compensating affiliates and related parties at rates higher than the prevailing market rate and charging those expenses to the joint account. In early 2016, after the parties failed to reach an agreement on the matter, OOGC initiated arbitration, seeking damages of $185–210 million. OOGC's arbitration demand pleaded two breach of contract claims. First, it claimed breach of Section 7.7 of the Agreements, which required quarterly reporting by Chesapeake on work done by Chesapeake's affiliates. Second, it claimed breach of Article V.D.1 of an addendum to the Agreements, which governed market pricing and charges to the joint account.

OOGC had the first chance to select an arbitrator and picked then-Locke Lord partner J. Robert Beatty. Chesapeake went next and picked Squire Patton Boggs partner D. Patrick Long. Beatty and Long together picked the third arbitrator and panel chairman, Wyoming litigator Donald I. Schultz. Each arbitrator supplied disclosures to the AAA, and neither party objected to any arbitrator. Long's disclosures did not include mention of a non-party company called FTS.

The arbitration schedule provided for four hearings, divided by topic. In the first hearing, the panel considered OOGC's Section 7.7 claim, concluding that Chesapeake breached its reporting duties under that section. The panel

also addressed the threshold question of whether FTS—one of the companies whose rates OOGC challenged—was a Chesapeake affiliate. The panel unanimously found that FTS was not a Chesapeake affiliate because FTS had never been under Chesapeake's control.

In the second and third hearings, the panel considered OOGC's Article V.D.1 claim. OOGC argued that FTS was a "related party" under the Agreements, that the market rate requirement for related parties was identical to the requirement for affiliates, and that Chesapeake compensated FTS at rates higher than the market rate. The panel unanimously concluded that, even assuming *arguendo* that FTS was a related party and that the market rate requirements for affiliates and related parties were identical, the rates at which Chesapeake compensated FTS met the market rate requirement. Although the panel ruled for OOGC on several other issues, it ultimately concluded that Chesapeake did not overbill the joint account for work performed by its affiliates and related parties under Article V.D.1.

About a month and a half later, OOGC filed an action in state court in Harris County, Texas, seeking to vacate the panel's awards. Specifically, OOGC complained that Long had failed to disclose his relationship with Yon Siang Goh, chairman of FTS's board of directors. Chesapeake removed the case to federal court on the basis of diversity of citizenship and asked the district court to affirm the awards.

In February 2017, OOGC filed an "Amended Motion to Vacate Arbitration Awards." In the motion, OOGC argued that the awards should be vacated because Long's connections to FTS showed "evident partiality" under 9 U.S.C. § 10(a)(2) and "misbehavior by which the rights of a[] party have been prejudiced" under § 10(a)(3). In addition to his connections to Goh, OOGC alleged that Long had connections to Goh's daughter Jolene and FTS's general counsel Jennifer Keefe, both of whom had previously worked at Long's law

firm.  The next day, the district court stayed the arbitration awards pending further proceedings.

Meanwhile, with the fourth arbitration hearing looming, OOGC complained about Long to the AAA.  In response, the AAA asked Long for additional disclosures about his connections to Goh and Keefe.  Long disclosed that Keefe formerly worked at Squire Patton Boggs, that the two had worked on numerous cases together, and that they remained friends after she left to join FTS.  Once at FTS, Keefe retained Long to represent the company in two oil and gas matters.  Long also disclosed that he and Goh had been business partners until 2010.[2]

The AAA concluded that Long should be removed from the panel.  In lieu of appointing a new arbitrator, Chesapeake suggested that Shultz and Beatty simply proceed as a quorum, pursuant to AAA rules. Shultz and Beatty agreed.

OOGC then asked the panel to postpone arbitrating the remaining claims pending resolution of their claims in the district court.  The panel denied the motion.  OOGC then moved in the district court to enjoin or stay the arbitration proceedings, and the district court granted the motion.

No rulings were issued by the district court through the remainder of 2017 and most of 2018, despite several unopposed requests from OOGC for a ruling or status conference.  Then, in December of 2018, the district court vacated the arbitration awards with an opinion titled "Opinion on Arbitration Corruption."  The district court concluded that OOGC satisfied the "evident partiality" standard under § 10(a)(2), stating that "[w]hen [Long] claimed that he did not have professional or social connections with the parties or witnesses,

---

[2] The parties dispute the number and nature of Long and Goh's prior business dealings.  Resolution of that dispute is unnecessary for the disposition of this appeal.

he lied." The opinion erroneously referred to Long as the arbitration panel's chairman and drew attention to what it termed his "deceit," and "corrupt[ion]."

Later that month, after learning of the district court's comments about him, Long filed an "Emergency Motion to Intervene" under Federal Rule of Civil Procedure 24. In the motion, Long argued that intervention was necessary to protect "his reputation for veracity and integrity, which has been harmed by the Opinion's statements that he is a liar and corrupt." He provided a declaration with his account of the facts, stating that he had no connection to the parties, and that the other individuals he was accused of having close relationships with were neither parties nor witnesses in the arbitration, and had no stake in the arbitration's outcome.

On December 28, 2018, Chesapeake appealed from the final judgment. Later that day, the district court denied Long's motion to intervene. Long then appealed that denial. He also filed a motion to intervene on appeal. We stayed the district court's judgment pending resolution of the appeal.

II.

This court reviews an order affirming or vacating arbitration awards de novo, "using the same standards that apply to the district court." *21st Fin. Servs., L.L.C. v. Manchester Fin. Bank*, 747 F.3d 331, 335 (5th Cir. 2014). "We accept findings of fact that are not clearly erroneous . . . ." *Hughes Training Inc. v. Cook*, 254 F.3d 588, 592 (5th Cir. 2001).

Review of the arbitration awards themselves is limited in order to "give deference to the decisions of the arbitrator." *Manchester*, 747 F.3d at 335. Judicial review of an arbitration award "is extraordinarily narrow" and we "defer to the arbitrator's decision when possible." *Antwine v. Prudential Bache Secs., Inc.*, 899 F.2d 410, 413 (5th Cir. 1990). In a dispute over an arbitration award, "[t]he burden of proof is on the party seeking to vacate the award, and

any doubts or uncertainties must be resolved in favor of upholding it." *Cooper v. WestEnd Capital Mgmt., L.L.C.*, 832 F.3d 534, 544 (5th Cir. 2016).

We review a district court's denial of a motion to intervene as of right de novo. *Taylor Commc'ns Grp., Inc. v. Sw. Bell Tel. Co.*, 172 F.3d 385, 387 (5th Cir. 1999). We review a district court's denial of permissive intervention for clear abuse of discretion. *Edwards v. City of Houston*, 78 F.3d 983, 995 (5th Cir. 1996) (en banc).

### III.

### A.

Chesapeake argues that the district court erred by vacating the arbitration awards for "evident partiality" under 9 U.S.C. § 10(a)(2). We agree.

The test for evident partiality in nondisclosure cases in the Fifth Circuit is set out in *Positive Software Solutions, Inc. v. New Century Mortgage Corp.*, 476 F.3d 278 (5th Cir. 2007) (en banc). In *Positive Software*, we stated that an arbitrator's nondisclosure must involve a "reasonable impression of bias" stemming from "a significant compromising connection to the parties" in order for vacatur to be warranted under § 10(a)(2). *Id.* at 283. This "stern standard" requires "a concrete, not speculative impression of bias" and calls for "upholding arbitral awards unless bias was clearly evident in the decisionmakers." *Id.* at 281, 286. Indeed, "for the arbitration award to be vacated," the party challenging the award "must produce specific facts from which a reasonable person would *have* to conclude that the arbitrator was partial to" its opponent. *WestEnd*, 832 F.3d at 545 (emphasis added).

Here, Chesapeake argues that FTS had no stake in the outcome of any of the arbitration proceedings, and therefore that Long's relationship with FTS did not amount to a "significant compromising connection to the parties." *Positive Software*, 476 F.3d at 283. FTS was not a party or witness in the arbitration, and OOGC's Article V.D.1 claim that Chesapeake compensated

FTS too highly in the past could only—at most—have resulted in damages against Chesapeake, not FTS. In other words, says Chesapeake, the issue was whether Chesapeake could properly charge the joint account for the rates it had paid FTS, not whether FTS could retain the rates it had already received for its work.[3] Similarly, OOGC's Section 7.7 claim that Chesapeake had certain reporting obligations vis-à-vis FTS imposed no requirements on FTS itself. Thus, argues Chesapeake, Long's relationship with FTS did not incentivize him to rule in the favor of FTS or any party.

OOGC offers two reasons that Long was incentivized to rule in Chesapeake's favor, but both fall short of the "concrete, not speculative" showing of a significant, compromising connection to the parties required for vacatur under § 10(a)(2). *Id.* at 286.

OOGC's first argument is that Long was incentivized to conclude that FTS was not a Chesapeake affiliate because the Agreements stated that qualified arbitrators must not "have performed material work" for an affiliate within the five-year period prior to initiation of arbitration. Because Long had represented FTS within that period, a conclusion that FTS was an affiliate would have disqualified him from sitting on the panel. Thus, says OOGC, Long was put in a position to decide his own status as a member of the panel—a decision that implicated his financial interest in continuing his employment as an arbitrator in the matter.

In context of the panel's overall decision-making, this theory of Long's bias in favor of Chesapeake is more "speculative" than "concrete," *id.* As an initial matter, Long was not directly faced with the question of his ability to arbitrate. His vote on the question of whether FTS was an affiliate only indirectly bore on his status as an arbitrator through a wholly different

---

[3] FTS had ceased performing work for Chesapeake by the time of the arbitration.

provision of the Agreements.  OOGC must speculate that, at the time of the panel's affiliate ruling, Long was aware of the provision of the Agreements concerning arbitrators' past work for affiliates—a provision that no party raised at the time.

Moreover, the panel's conclusion that FTS was not a Chesapeake affiliate was rendered essentially meaningless by the panel's assumption (in OOGC's favor) that the same market rate requirements that applied to affiliates also applied to FTS.  The panel determined that, even assuming that FTS was covered by the affiliate rules, OOGC's Article V.D.1 overcompensation claim failed anyway because Chesapeake properly compensated FTS under the Agreements.[4]  The lack of import of the panel's affiliate conclusion militates against OOGC's theory that Long's connection to FTS constituted a "significant compromising connection to the parties." *Id.* at 283.[5]

Perhaps recognizing the uphill climb it faces to surmount the *Positive Software* nondisclosure standard, OOGC attempts to analogize this case to an out-of-circuit case that does not implicate nondisclosure: *Pitta v. Hotel Association of New York City*, 806 F.2d 419 (2d Cir. 1986).  In the "rare[]" circumstances at issue in *Pitta*, Millard Cass received an employment agreement appointing him to arbitrate a dispute. *Id.* at 421.  One of the parties

---

[4] As to the reporting requirements under Section 7.7, OOGC has explained that they merely "allow OOGC to meaningfully verify and, if necessary, contest Chesapeake's Affiliate charges to the joint account."  And the panel had already declined to award OOGC any equitable relief for violations of Section 7.7.

[5] OOGC argues that Chesapeake waived this argument because it discussed Long's alleged incentive to rule that FTS was not an affiliate in order to remain on the panel in the section of its brief dealing with *Pitta v. Hotel Association of New York City*, 806 F.2d 419 (2d Cir. 1986), not the section of its brief dealing with *Positive Software*.  This amounts to an invitation to penalize Chesapeake for failing to perfectly anticipate and mirror the structure of OOGC's response brief—an invitation we decline.  Chesapeake clearly argued that this alleged incentive was an insufficient ground for vacatur under § 10(a)(2).

subsequently notified Cass that it was "terminating [his] appointment." *Id.* The other party protested and asked Cass to arbitrate the issue of "whether he had been validly dismissed" under his employment contract. *Id.* In the resulting litigation, the Second Circuit determined that there was evident partiality under § 10(a)(2)[6] because Cass was asked "to interpret his own contract of employment" to "determine[] the validity of his own dismissal from a lucrative position." *Id.* at 420, 424. In doing so, the Second Circuit recognized the unusual nature of the dispute, calling it "rarely litigated." *Id.* at 420.

*Pitta* is a poor analogue to the present case. Unlike Cass, Long was not asked to decide whether his own status as an arbitrator was valid. Instead, he was asked to determine whether FTS was an affiliate of Chesapeake. Although that question incidentally bore on his ability to arbitrate via a separate provision of the Agreements, Long did not sit in judgment of that separate question. This takes the present case outside the ambit of the "rarely litigated" circumstances in *Pitta*. Indeed, expanding *Pitta* to bar arbitrators from deciding questions that only indirectly bear on their ability to arbitrate would risk the very "proliferat[ion]" of "[e]xpensive satellite litigation over . . . an arbitrator's 'complete and unexpurgated business biography'" that this court sought to avert in *Positive Software*. 476 F.3d at 285 (quoting *Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145, 151 (1968) (White, J., concurring)).

OOGC's second argument is that Long was incentivized to rule in ways that benefitted FTS, Goh, and Keefe because that would increase his chances of receiving future legal work from FTS. It argues that the panel's ruling that FTS was not a Chesapeake affiliate aided FTS because it meant Chesapeake did not have to turn over FTS's pricing information to OOGC. It further argues

---

[6] The *Pitta* court cited to § 10(b), which was then the evident partiality provision.

that the panel's affiliate ruling aided FTS because it meant FTS's future rates would not be subject to caps on affiliate rates set out in the Agreements.

This theory also falls short of a showing of "specific facts from which a reasonable person would have to conclude that the arbitrator was partial to" a party. *WestEnd*, 832 F.3d at 545 (quoting *Householder Grp. v. Caughran*, 354 F. App'x 848, 852 (5th Cir. 2009)). OOGC begins by speculating that FTS would be harmed by OOGC receiving its pricing information, that FTS would actually perform any future work for Chesapeake under the Agreements, and that the affiliate rate cap would not also apply to FTS as a related party.[7] Adding speculation to speculation, OOGC hypothesizes that these possible, incidental harms to FTS flowing from a *unanimous* arbitration panel ruling would make Long think that he needed to rule in FTS's favor or else it would take him personally to task by declining to retain him in future matters.[8] This is simply too much conjecture.[9] Accepting OOGC's argument would create an "incentive to conduct intensive, after-the-fact investigations to discover the most trivial of relationships," undercutting the purpose of arbitration "as an efficient and cost-effective alternative to litigation." *Positive Software*, 476 F.3d at 280, 285.

---

[7] OOGC itself argued—and the panel assumed to be true for purposes of its rate decision—that related parties were subject to the same rate cap as affiliates under the Agreements.

[8] Interestingly, Long had previously performed work adverse to Chesapeake—a fact that did not deter Chesapeake from appointing him to the arbitration panel.

[9] OOGC moves on appeal for this court to take judicial notice of facts concerning work Long has done for FTS, contending that these facts support its argument that Long "enhance[d] his prospects for future legal work" by ruling for Chesapeake. We deny the motion. Even if we were to grant it, the facts provided do not change our conclusion that OOGC's theory about Long's partiality is too speculative.

No. 19-20002 c/w No. 19-20003

In sum, OOGC has not shown evident partiality under § 10(a)(2). The district court erred in reaching the contrary conclusion.

B.

OOGC urges that—even if there is no evident partiality—we should affirm the vacatur under 9 U.S.C. § 10(a)(4) and this court's decision in *PoolRe Insurance v. Organizational Strategies, Inc.*, 783 F.3d 256 (5th Cir. 2015). We disagree.[10]

Section 10(a)(4) permits vacatur "where the arbitrators exceeded their powers." 9 U.S.C. § 10(a)(4). In *PoolRe*, the arbitration agreement at issue mandated that the arbitrator be "selected by the Anguilla, B.W.I. Director of Insurance." 783 F.3d at 263. The arbitrator who presided over the proceedings in *PoolRe* "was not appointed by the Director of Insurance." *Id.* Because "[t]he power and authority of arbitrators in an arbitration proceeding [are] dependent on the provisions under which the arbitrators were appointed," and the arbitrator in *PoolRe* "had not been 'selected according to the contract-specified method,'" we determined that he had exceeded his powers under § 10(a)(4). *Id.* at 263–64 (second alteration in original) (first quoting *Brook v. Peak Int'l, Ltd.*, 294 F.3d 668, 672 (5th Cir. 2002); then quoting *Bulko v. Morgan Stanley DW Inc.*, 450 F.3d 622, 624 (5th Cir. 2006)).

---

[10] Both parties insist that the other party waived the § 10(a)(4) issue. OOGC argues that Chesapeake waived the issue by not raising it in its opening brief. *See United States v. Elashyi*, 554 F.3d 480, 494 n.6 (5th Cir. 2008) ("An appellant that fails to adequately brief an issue in his opening brief waives that issue."). But, as Chesapeake points out, OOGC did not cite § 10(a)(4) in its motion to vacate in the district court, instead only raising it in a footnote in its motion to enjoin the arbitration proceedings. And "arguments raised in a perfunctory manner, such as in a footnote, are waived." *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 356 n.7 (5th Cir. 2003) (quoting *United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002)). While the failure of OOGC's § 10(a)(4) argument on the merits absolves us of the need to determine whether OOGC waived the issue, OOGC's placement of the argument in a solitary footnote in the district court certainly militates against the conclusion that Chesapeake waived the issue by not addressing § 10(a)(4) in its opening brief.

OOGC argues that Long exceeded his powers here because he violated "the contractual requirement that he be 'neutral'" given that "(1) he had represented alleged Chesapeake 'Affiliate' FTS one year before the arbitration, and (2) the arbitration provision prohibits one from sitting as arbitrator if he had done material work for a Chesapeake 'Affiliate' within five years before the arbitration." But this is a gripe about an arbitrator's *qualifications* to serve, not a failure to select an arbitrator according to the terms of the contract. And OOGC admits, as it must, that we have treated arbitrator-selection cases like *PoolRe* as "distinguishable" from arbitrator-qualifications cases like this one. *Bulko*, 450 F.3d at 625. Indeed, it points to no case in which we have held that a failure to satisfy contractually specified qualifications warrants vacatur under § 10(a)(4).

At any rate, the contract's specification that arbitrators must be "neutral parties" is not an expansive one. Instead, it appears to refer to the qualifications set out in the remainder of the sentence: arbitrators must be "neutral parties who have never been officers, directors or employees of the Parties or any of their Affiliates, or have performed material work for either of the Parties or its Affiliates within the preceding five (5) year period." Thus, Long's work for FTS would only cause him to be unqualified under the contract if FTS was, in fact, an affiliate.

The burden of proof is on OOGC to show that the unanimous panel's conclusion on this issue was erroneous, and it fails to persuasively do so. *See WestEnd*, 832 F.3d at 544. The Agreements define affiliates as entities over which a party "directly or indirectly" exercises "[c]ontrol." All three arbitrators on the panel reasonably determined that Chesapeake's minority ownership ("from 24% to 30%") and board seats ("two members of a board that ranged from five to seven members") were insufficient evidence of "control." And even OOGC allows that the district court did "not apply[] the Agreements' definition

of a capital-'A' 'Affiliate,' but rather apparently used its own, 'common sense definition' under which an 'affiliate' relationship exists if 'one person or entity has a material interest in another.'"

Resolving all "doubts or uncertainties . . . in favor of upholding" the awards, *id.*, we conclude that OOGC has not shown an adequate basis for vacatur under § 10(a)(4). Neither this conclusion nor our conclusion that OOGC has not shown evident partiality under § 10(a)(2) is an endorsement of Long's actions. We merely determine that OOGC has not met the stringent standards necessary to make "[t]he draconian remedy of vacatur" appropriate. *Positive Software*, 476 F.3d at 286.

## IV.

We now turn briefly to Long's attempts to intervene in this case. He asserts that the district court opinion "unfairly maligned his reputation" by "calling him a liar and corrupt" and seeks leave to intervene "to demonstrate his veracity, ethics, and integrity."

## A.

Long's first motion to intervene was in the district court. The district court denied the motion on its merits, but not until after Chesapeake had filed its notice of appeal earlier that same day. Long appealed. We conclude that the district court lacked jurisdiction to hear the motion. *See Nicol v. Gulf Fleet Supply Vessels, Inc.*, 743 F.2d 298, 299 (5th Cir. 1984) ("If an appeal is taken from a judgment which determines the entire action, the district court loses power to take any further action in the proceeding upon the filing of a timely and effective notice of appeal, except in aid of the appeal or to correct clerical errors under Rule 60(a). That is the general rule in this Circuit, and it has been applied to motions for intervention." (citation omitted)).

Long urges us to avoid this result by adopting the Ninth Circuit's holding in *Long v. Bureau of Economic Analysis*, 646 F.2d 1310 (9th Cir. 1981), *vacated*

No. 19-20002 c/w No. 19-20003

*on other grounds*, 454 U.S. 934 (1981) that "the district court was not divested of jurisdiction" to rule on a motion to intervene where the notice of appeal and district court order were filed "on the same day." *Id.* at 1318–19; *see also id.* at 1319 (referring to such circumstances as mere "fortuity of the docketing"). We decline to do so. The district court's denial of the motion is therefore affirmed, though on different grounds. *See Nicol*, 743 F.2d at 299 ("We affirm the denial of intervention because the district court was without jurisdiction to rule upon the [intervention] motion once [the plaintiff] had filed his notice of appeal.").

### B.

Long also moves to intervene as of right in this court under Federal Rule of Civil Procedure 24(a)(2), as well as for permissive intervention under Rule 24(b)(1)(B). Long freely admits that he has no "preference in the outcome of the parties' dispute, for which he takes no position." Instead, his wish is for the court to "correct [certain alleged] factual misstatements" in the district court's opinion. But there is no cause to "correct" statements in a ruling that is already being vacated. *See Brockman v. Tex. Dep't of Criminal Justice*, 397 F. App'x 18, 24 (5th Cir. 2010) ("Because we . . . VACATE the portions of the opinion below which concern [the proposed intervenor] . . . the motion to intervene is denied as moot."). Because this court is vacating the district court's decision for the reasons discussed *supra*, Long's motion to intervene on appeal is denied as moot.

### V.

For the reasons stated, we VACATE the district court's arbitration ruling and REMAND the action with instructions to confirm the arbitration awards within thirty days of the issuance of the mandate. We DENY OOGC's motion for judicial notice, AFFIRM the district court's denial of Long's motion to intervene, and DENY AS MOOT Long's motion to intervene on appeal.

15